PROVIDED TO PUTNAM
CORRECTIONAL
ON 1·25·2022
FOR MAILING
BY _____

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

**STEVEN WINCH,**
*Plaintiff,*

**v.**

Case No.: 3·22CV104-HLA-PDB

**CENTURION OF FLORIDA, LLC, et al.**
*Defendant(s).*

_____/

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

### I.    The Parties to This Complaint

#### A. The Plaintiff(s)

Name: Steven Winch

All other names by which you have been known: Steve Winch

ID Number: L21077

Current Institution: Putnam Correctional Institution

128 Yelvington Road, East Palatka, Florida 32131

CLERK US DISTRICT COURT
MIDDLE DISTRICT OF FL
JACKSONVILLE FLORIDA

2022 JAN 31 AM 9: 59

FILED

#### B. The Defendant(s)

<u>Defendant No. 1</u>

Name: Centurion of Florida, LLC

Job or Title: Contracted by the Florida Department of Correction to provide health care services to inmates incarcerated in the Florida Department of Corrections.

Address:  2724 NE 14th Street, Ocala, FL 34470

Individual Capacity    ☑ Official Capacity

<u>Defendant No. 2</u>
Name: D. Jenkins
Job or Title: Advanced Practice Registered Nurse
Employer: Centurion of Florida, LLC
Address: 2724 NE 14th Street, Ocala, FL 34470
    ☑ Individual Capacity    ☑ Official Capacity

<u>Defendant No. 3</u>
Name: C. Marius
Job or Title: Medical Doctor
Employer: Centurion of Florida, LLC
Address: 2724 NE 14th Street, Ocala, FL 34470
    ☑ Individual Capacity    ☑ Official Capacity

<u>Defendant No. 4</u>
Name: L. Romulus
Job or Title: Advanced Practice Registered Nurse
Employer: Centurion of Florida, LLC
Address: 2724 NE 14th Street, Ocala, FL 34470
    ☑ Individual Capacity    ☑ Official Capacity

<u>Defendant No. 5</u>
Name: H. Bhadja
Job or Title: Medical Doctor
Employer: Centurion of Florida, LLC
Address: 2724 NE 14th Street, Ocala, FL 34470
    ☑ Individual Capacity    ☑ Official Capacity

<u>Defendant No. 6</u>
Name: D. Wetterer
Job or Title: Medical Doctor
Employer: Centurion of Florida, LLC
Address: 2724 NE 14th Street, Ocala, FL 34470
    ☑ Individual Capacity    ☑ Official Capacity

Defendant No. 7
Name: R. Molina
Job or Title: Medical Director/Medical Doctor
Employer: Centurion of Florida, LLC
Address: 2724 NE 14th Street, Ocala, FL 34470
    ☑ Individual Capacity   ☑ Official Capacity

Defendant No. 8
Name: S. Perry
Job or Title: Advanced Practice Registered Nurse
Employer: Centurion of Florida, LLC
Address: 2724 NE 14th Street, Ocala, FL 34470
    ☑ Individual Capacity   ☑ Official Capacity

Defendant No. 9
Name: R. Laubaugh
Job or Title: Medical Doctor
Employer: Centurion of Florida, LLC
Address: 2724 NE 14th Street, Ocala, FL 34470
    ☑ Individual Capacity   ☑ Official Capacity

Defendant No. 10
Name: Max Solano
Job or Title: Medical Doctor
Employer: Subcontracted by Centurion of Florida, LLC
Address: c/o Centurion of Florida L.L.C.,
   2724 NE 14th Street, Ocala, FL 34470
    ☑ Individual Capacity   ☑ Official Capacity

Defendant No. 11
Name: Jackie Westfall
Job or Title: Medical Director/Medical Doctor
Employer: Centurion of Florida, LLC
Address: 2724 NE 14th Street, Ocala, FL 34470
    ☑ Individual Capacity   ☑ Official Capacity

3

Defendant No. 12
Name: Loretta Dawson
Job or Title: Advanced Registered Nurse Practitioner
Employer: Centurion of Florida, LLC
Address: 2724 NE 14th Street, Ocala, FL 34470
    ☑ Individual Capacity    ☑ Official Capacity

Defendant No. 13
Name: Jane Doe #1
Job or Title: Registered Nurse
Employer: Centurion of Florida, LLC
Address: 2724 NE 14th Street, Ocala, FL 34470
    ☑ Individual Capacity    ☑ Official Capacity

Defendant No. 14
Name: Jane Doe #2
Job or Title: Registered Nurse
Employer: Centurion of Florida, LLC
Address: 2724 NE 14th Street, Ocala, FL 34470
    ☑ Individual Capacity    ☑ Official Capacity

## II.  Basis for Jurisdiction

### A. Are you bringing suit against

    ☐ Federal officials (a *Bivens* claim)

    ☑ State or local officials (a § 1983 claim)

**B.** Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]" 42 U.S.C. § 1983. If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials? Amendment Eight of the U.S. Constitution

C. Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983. If you are suing under Section 1983, explain how each defendant acted under color of state or local law.

## III. Prisoner Status

Indicate whether you are a prisoner or other confined person as follows: Convicted and sentenced state prisoner currently in the physical custody of the Florida Department of Corrections ("FDC").

## IV. Statement of Claim

A. If the events giving rise to your claim arose outside an institution, describe where and when they arose.  N/A

B. If the events giving rise to your claim arose in an institution, describe where and when they arose.

Taylor Correctional Institution – July 6, 2018 thru December 26, 2018
South Florida Reception Center-South Unit – January 2019 thru June 2019
Okeechobee Correctional Institution  – July 2019 thru December 2019
Madison Correctional Institution –  April 2020 thru July 2020
Mayo Correctional Institution  –  July 2020  thru November 2020
Putnam Correctional Institution – December 2020 thru Present
Reception and Medical Center – on August 9, 2021

C. What date and approximate time did the events giving rise to your claim(s) occur?   July 2018 thru Present.

**D.**                          **STATEMENT OF FACTS**

1) Approximately, in the month of April of 2017, Plaintiff began suffering from skin irritation, rash-like bumps, itching, and sores.

2) On or about May 1, 2017, Plaintiff sought medical attention for these symptoms and was diagnosed with scabies. Permetherin Lotion, in addition with a two (2) week follow-up dose of Ivermectin was prescribed.

3) In just a few weeks after using the medications for treatment as prescribed, it became apparent to Plaintiff that the treatment failed to resolve his skin disease.

4) Plaintiff's skin disease continued in its progression, causing him to suffer from skin irritation, rash-like bumps, itching, and sores.

5) Approximately, in the month of June 2017, Plaintiff submitted a Sick Call Request complaining of itching, rash-like bumps and excoriated lesions.

6) After being referred to the care provider, Plaintiff was again diagnosed with scabies and was prescribed similar medication for treatment.

7) On September 1, 2017, Plaintiff was transferred to New River Correctional Institution.

8) Plaintiff submitted a Sick Call Request complaining of intense itching, rash-like bumps, and excoriated lesions.

9) Plaintiff was diagnosed with scabies and was prescribed Ivermectin and

Benadryl.

10) Sometime in late 2017 or early 2018, Plaintiff was seen by the care provider and a skin sample was extracted from his left forearm for biopsy.

11) The test result returned no evidence of scabies, e.g., mites or larva. The results of the test returned that Plaintiff had a condition called 'Hyperkeratosis.'

12) Approximately, March or April of 2018, Plaintiff was seen by the care provider and was prescribed one injection of steroid, name unknown.

13) Approximately, in the month of May 2018, Plaintiff declared a medical emergency due to his suffering from intense itching, rash-like bumps, excoriated lesions, infections, and pain. Plaintiff was again diagnosed with scabies, was prescribed Permetherin Lotion, Ivermectin, Triamcinolone Acetonide Ointment USP, 0.01%, and antibiotics (name unknown).

14) On July 6, 2018, Plaintiff was transferred to Taylor Correctional Institution.

15) Within a weeks' time of his arrival at Taylor C.I., Plaintiff was seen by D. Jenkins, hereinafter Defendant Jenkins, for a follow-up of his skin disease and was prescribed medication for treatment, e.g. Triamcinolone Acetonide Ointment USP, 0.01% and some other type of medication (possibly antibiotics).

16) Plaintiff's skin disease continued in its progression, causing intense itching, rash-like bumps, excoriated lesions, painful skin infections, and scarring of

the skin.

17) Approximately, August or September of 2018, Plaintiff was seen by Defendant Jenkins and was prescribed Ketoconazole Cream to apply to the affected areas daily and Fluconazole to be taken orally two times daily for 14 days for treatment of his skin disease.

18) Approximately, September of 2018, Plaintiff was seen by Defendant Jenkins and was prescribed Triamcinolone Acetonide Ointment USP, 0.01%.

19) Approximately, September of 2018, Plaintiff submitted an institutional level Formal Grievance regarding the prescribing of the same medications that proved to be ineffective for the treatment of his skin disease.[1] This grievance was returned denied. The following response was provided:

> "Inmates do not have the authority to dictate what medications or treatments the care provider deems appropriate."

20) After not getting better using the medications prescribed to Plaintiff, Defendant Jenkins determined that Plaintiff required a level of care beyond her level of expertise and asked him to sign a Consultation Request because she was going to refer him to a specialist.

21) On October 3, 2018, Plaintiff submitted an Appeal to the Secretary of the Florida Department of Corrections (FDC) after his institutional level Formal

---

[1] Formal Grievance, log # 1809-218-058

Grievance regarding the prescribing of the same medication was returned denied.

22) On October 15, 2018, Plaintiff was seen by Defendant Jenkins and was informed that the Consultation Request was disapproved.[2] No medical explanation for the denial was provided to Plaintiff.

23) Plaintiff asked Defendant Jenkins to submit another Consultation Request.

24) Defendant Jenkins refused to submit another Consultation Request.

25) Sometime in late October or November 2018, Defendant Jenkins diagnosed Plaintiff with scabies and prescribed Ivermectin for treatment.

26) Plaintiff informed that that medication has been prescribed in the past and was not effective in resolving his skin disease or provided him relief.

27) As expected, after completing the medications as prescribed, Plaintiff continued to suffer from the symptoms of his skin disease and continued to seek medical.

28) On November 17, 2018, Plaintiff's appeal to the Secretary of FDC regarding the continued prescribing of the same medications and courses of treatments that proved to be ineffective was returned denied.[3]

29) On December 26, 2018, Plaintiff was transferred to South Florida Reception Center and was moved later to their South Unit on January 8, 2019.

---

[2] First denial of Specialist Consultation Request.

[3] Grievance Appeal, log # 18-6-43011

30) On January 13, 2019, Plaintiff submitted a Sick Call Request.

31) Plaintiff was seen by the nurse in Sick-Call and was referred to the care provider for treatment of his skin disease which continued on in its progression causing him to suffer from intense itching, rash-like bumps, excoriated lesions, and difficulty sleeping.

32) On January 25, 2019, Plaintiff was seen by C. Marius, M.D, hereinafter Defendant Marius, was diagnosed with scabies, and was prescribed Permetherin Lotion and/or Ivermectin for treatment.

33) Plaintiff discussed the medications being prescribed with Defendant Marius, specifically the fact that they have not been effective in treating his skin condition in the past.

34) On February 2, 2019, Plaintiff submitted a Sick Call Request.

35) On February 4, 2019, Plaintiff submitted an institutional level Grievance regarding the continued prescribing of the same medications and courses of treatments that proved to be ineffective.[4]

36) On or about February 18, 2019, Plaintiff's institutional level Formal Grievance regarding the continued prescribing of the same medications and courses of treatments that proved to be ineffective was returned denied.

37) On February 25, 2019, Plaintiff submitted an Appeal to the Secretary of FDC

---

[4] Formal Grievance, log # 1902-402-011

10

from the denial of his institutional level Formal Grievance regarding the continued prescribing of the same medications that proved to be ineffective. [5]

38) On March 20, 2019, Plaintiff was seen by Defendant Marius, was diagnosed with scabies, and was prescribed Permetherin Lotion and/or Ivermectin for treatment.

39) On April 24, 2019, Plaintiff was seen by Defendant Marius. The following occurred:

   a. Plaintiff was diagnosed with scabies, and was prescribed Permetherin Lotion and/or Ivermectin for treatment.

   b. Plaintiff complained that the treatments do not help.

   c. Plaintiff requested to be sent to a specialist.

   d. Defendant Marius refused to submit a Consultation Request for specialty care.[6]

40) On May 15, 2019, Plaintiff was seen by Defendant Marius, was diagnosed with scabies, and was prescribed Permetherin Lotion and/or Ivermectin for treatment.

   a. Again, Plaintiff complained that the treatments do not help

   b. Plaintiff requested to be sent to a specialist.

   c. Defendant Marius refused to submit a Consultation Request for specialty

---

[5] Grievance Appeal, log # 19-6-08989

[6] Refusal to submit Consultation Request for specialist.

care.[7]

41) All prescribed medications and treatments failed to resolve Plaintiff's skin disease.

42) On June 5, 2019, Plaintiff declared a medical emergency due to his suffering from intense itching, rash-like bumps, excoriated lesions, infections, pain, and difficulty sleeping. The following occurred after making the declaration:

   a. Plaintiff was examined by the care provider.

   b. Plaintiff consented to and provided a skin sample from his right leg for biopsy.

   c. Plaintiff was prescribed antibiotic cream (name unknown) and Triamcinolone Acetonide Cream USP, 0.01%.

43) Approximately, middle of July of 2019, Plaintiff declared a medical emergency due to the intensity of the symptoms he suffered, e.g., rash-like bumps, intense itching, excoriated lesions, infections, pain, and difficulty sleeping.

44) On July 25, 2019, Plaintiff was transferred to Okeechobee Correctional Institution. The following occurred upon his arrival:

   a. Immediately after his arrival at Okeechobee C.I., Plaintiff was seen by a nurse during the intake process.

---

[7] Refusal to submit Consultation Request for specialist.

b. The nurse immediately referred Plaintiff to see the physician/care provider due to the state of his current condition.

c. Plaintiff was seen by L. Romulus, hereinafter Defendant Romulus, and H. Bhadja, hereinafter Defendant Bhadja.

d. Both Defendant's Romulus and Bhadja diagnosed Plaintiff with scabies and prescribed medications for treatment were prescribed, e.g., Permetherin Lotion and Ivermectin.

e. Plaintiff complained to them how all the previous times he was prescribed Permetherin Lotion and Ivermectin medications failed to help resolve his skin disease.

f. Plaintiff was placed in Protective Management isolation. (Due to the state of his current condition and appearance, Plaintiff sought to be placed in Protective Management isolation instead of being assigned to a housing assignment located in open population because of his fear of being physically harmed by other inmates.)

45) Shortly after completing the prescribed treatments, it was apparent to Plaintiff that the prescribed treatments failed to resolve his skin disease, as his symptoms persisted, causing him to suffer from intense itching, rash-like bumps, excoriated lesions all over his body, infections, and severe pain from the infections, scarring of the skin, and difficulty sleeping.

46) On or about August 6, 2019, Plaintiff declared a medical emergency due to intense itching, rash-like bumps, numerous excoriated lesions, severe pain from the infections, and difficulty sleeping.

47) On or about August 7, 2019, Plaintiff was scheduled an appointment with Defendant Romulus to have skin samples extracted for biopsy; a total of three (3) from different areas of Plaintiff's skin.

48) On or about August 20, 2019, Plaintiff was seen by Defendant Bhadja to go over the biopsy results. The following occurred during the appointment:

   a. Plaintiff was advised that there was no evidence of scabies found but the results of the skin sample determined that Plaintiff had Verrucca Vulgaris.

   b. Plaintiff was advised that a Consultation Request would be submitted to see a specialist.

49) Defendant Bhadja had also prescribed Plaintiff Betamethasone Diproportionate Cream USP, 0.05%, which is a high potency topical steroid and Prednisone during appointments with him.

50) On September 17, 2019, Plaintiff was seen by Defendant Wetterer and was diagnosed with scabies and prescribed medication, four (4) weekly doses of Ivermectin for treatment.

51) On October 14, 2019, Plaintiff was seen by a specialist, Max Solano, DR, hereinafter Defendant Solano, for his skin disease. The following occurred

during the appointment.

   a. Defendant Solano recommended medication –Neurontin and Prednisone– be prescribed to Plaintiff.

   b. Defendant Solano requested for a follow-up with him in one month.

52) On November 4, 2019, Plaintiff had a follow up appointment with Defendant Solano. The following occurred during the appointment:

   a. Defendant Solano examined different areas of Plaintiff's skin.

   b. Plaintiff informed Defendant Solano that the medications he recommended to be prescribed, so far, were not beneficial in the treatment of his skin disease.

   c. Plaintiff explained to Defendant Solano that his symptoms had increased in their progression while using the medications he recommended to be prescribed.

   d. Plaintiff pointed at different areas of his skin, showing Defendant Solano inflammation of the skin, multiple pus-filled bumps and excoriated lesions.

   e. Defendant Solano recommended for Plaintiff to continue taking Neurontin at a higher dosage level in addition to some other type of medication, name of medication unknown to Plaintiff.

   f. Defendant Solano recommended for Plaintiff to have a follow-up with him in three (3) months.

53) On November 21, 2019, Plaintiff arrived at Okeechobee Correctional Institution, the institution where he was previously assigned prior to his medical appointments with the specialist at the Department of Corrections Reception and Medical Center.

54) On November 28, 2019, Plaintiff learned that the medical department discontinued the medication (Neurontin); citing that that class of medication was not allowed to be prescribed to inmates at Plaintiff's current assigned facility.

55) On February 6, 2020, Plaintiff was transferred back to the Florida Department of Corrections Reception and Medical Center to await a follow up appointment with the specialist.

56) Plaintiff did not have a three-month follow up appointment with Defendant Solano as he had recommended.[8]

57) On February 18, 2020, Plaintiff submitted an institutional level Formal Grievance, regarding not receiving adequate medical care.[9]

58) On March 11, 2020, Plaintiff's institutional level Formal Grievance was denied. The following response was provided:

> "Review of records indicates that you are scheduled to see the Dermatologist in the near future. You are being

---

[8] February 4, 2020, would have been the target date for a three month follow-up with the specialist (Defendant Solano).

[9] Formal Grievance, log # 2002-209-130

treated in accordance with DC policy and procedure."

59) On March 24, 2020, Plaintiff submitted an appeal to the Secretary of FDC from the denial of institutional level Formal Grievance regarding not receiving adequate medical care.

60) On or about March 30, 2020, Plaintiff submitted a Sick Call Request complaining of skin infections on the back of his head and upper-neck area that were causing him severe pain, the inability to lay his head down, and limited the mobility of his head.

61) On or about April 1, 2020, Plaintiff was scheduled an appointment with the nurse-on-duty and was examined. The following occurred:

   a. The nurse-on-duty referred Plaintiff for an immediate –same day– appointment to see the care provider.

   b. The care provider diagnosed Plaintiff with having abscesses and prescribed antibiotics for treatment.

62) The abscesses caused deep skin scarring and loss of hair on Plaintiff's head.

63) On April 17, 2020, Plaintiff was transported by ambulance to Jacksonville Memorial Hospital after being attacked by another inmate.

   a. Plaintiff suffered a collapsed lung, multiple fractured ribs, head trauma, and other bruises and abrasions.

   b. The attack on Plaintiff committed by the other inmate was initiated due to

the appearance of Plaintiff's skin disease.[10]

64) On April 23, 2020, Plaintiff was released from Jacksonville Memorial Hospital and was transported to Madison Correctional Institution.

65) During follow-up appointments with the care provider for the injuries Plaintiff sustained from the assault by another inmate, Plaintiff also sought medical care for his skin disease and was prescribed medication, Triamcinolone Acetonide Cream USP, 0.01%, a 30 day supply of antibiotics (name unknown), and Benadryl for treatment of his skin disease.

66) While awaiting a follow-up appointment with the specialist, Plaintiff's skin disease continued in its progression even while he was using the medications prescribed; suffering rash-like bumps, intense itching, excoriated lesions, infections, severe pain from the infections, and difficulty sleeping.

67) On April 29, 2020, Plaintiff received a response on his appeal to the Secretary of FDC regarding not receiving adequate medical care.[11]   The following response was provided:

> "Appeal denied. Your request for administrative remedy was received at this office and carefully evaluated. Records available to this office were also reviewed. It is determined that the response made to you by Dr. Bassa on 3/11/2020 appropriately addresses the issue you

---

[10] Plaintiff made a witness statement in writing on Form DC6-112C regarding the attack during the investigation prior to his transport by ambulance to Jacksonville Memorial Hospital by ambulance.

[11] Grievance Appeal, log # 20-6-12057

presented."

68) On May 18, 2020, because Plaintiff still had not had a follow-up with the specialist as recommended, Plaintiff submitted an institutional level Formal Grievance regarding not being provided access to necessary medical specialist for the treatment of his serious chronic skin disease.[12]

69) On May 22, 2020, Plaintiff's institutional level Formal Grievance regarding not being provided access to necessary medical specialist for the treatment of his serious chronic skin disease was denied. The following response was provided:

> ".... Your issues were being addressed and you were not refused access to care. Due to the Pandemic all appointments have been rescheduled. You will be evaluated by the specialist once the movement restrictions are released and appointments are rescheduled."

70) On May 27, 2020, Plaintiff submitted an appeal to the Secretary of FDC from the denial of his institutional level Formal Grievance regarding not being provided access to necessary medical specialist for the treatment of his serious chronic skin disease.[13]

71) On or about June 15, 2020, Plaintiff finally had a follow-up consultation with Defendant Solano (4 months later than when the consultation was supposed to

---

[12] Formal Grievance, log # 2005-216-029

[13] Grievance Appeal, log # 20-6-18999

be). Defendant Solano did the following during the appointment:

a. He conducted a cursory examination of Plaintiff's skin disease. No clothing was removed.[14]

b. He used a broken tongue depressor to lightly draw on Plaintiff's skin to determine if his skin was dehydrated but only found the skin to be very thin as evidenced by how easily his skin was lacerated when he lightly drew the broken tongue depressor across it.

c. He recommended that Plaintiff no longer be prescribed Triamcinolone Acetonide Cream USP, 0.01% or other topical steroids.

d. He recommended that Plaintiff be prescribed Ammonion Lactate 12% Moisturizing Cream for the treatment of his skin disease.

e. He did not make a recommendation for any further follow-up consultations with him.

f. He informed Plaintiff that the symptoms Plaintiff was showing was not symptoms of scabies infestation.

72) Within a few days of Plaintiff's appointment with the specialist on or about June 15, 2021, a nurse confiscated his prescription medication, Triamcinolone

---

[14] Plaintiff was fully shackled, handcuffed, and chained around his waist due to his current classification status of Protective Management during the entirety of the appointment with Defendant Solano.

Acetonide Cream USP, 0.01%.[15]

73) On July 2, 2020, Plaintiff was transferred to Mayo Correctional Institution.

74) On July 14, 2020, Plaintiff's appeal of his institutional level Formal Grievance regarding not being provided access to a medical specialist for the treatment of his serious chronic skin disease was returned denied. The following response was provided:

> "It is the responsibility of your health care staff to determine the appropriate treatment regimen for the condition you are experiencing. Records reviewed indicate that you were seen by the Clinician on 6/2/2020, where you could address your medical concerns at that time."

75) On July 21, 2020, Plaintiff began receiving the moisturizing cream recommended by Defendant Solano to use as treatment for his serious skin disease.

76) On July 31, 2020, Plaintiff was seen by the care provider/Medical Director at Mayo C.I., R. Molina, MD, hereinafter Defendant Molina. During the appointment the following occurred:

a. Defendant Molina advised that Plaintiff was there to see whether the medical hold that was placed on him while he was at Madison C.I. was still necessary.

---

[15] It was determined by Defendant Solano that this type of medication was the cause of Plaintiff's very thin skin and recommended for Plaintiff to not be prescribed this medication for treatment in the future.

     b. Plaintiff brought to Defendant Molina's attention that the current state of his skin disease was poor. He informed him of his intense itching, rash-like bumps, and excoriated lesions.

     c. Defendant Molina stated "I don't know about that. You are only here about the medical hold. You will have to sign up for sick call.

77) On July 31, 2021, after being dismissed from his appointment with Defendant Molina, Plaintiff submitted a Sick Call Request.

78) On August 6, 2020, Mayo Correctional Institution was officially placed on quarantine status.

79) On August 12, 2020, S. Perry, ARNP, hereinafter Defendant Perry, fraudulently claimed and documented that Plaintiff was seen by her on this date, fraudulently documented that she diagnosed Plaintiff with scabies, and prescribed medication for treatment.[16]

80) Due to institutional quarantine status that began on August 6, 2020, all medical appointments were cancelled and/or rescheduled.

81) On or about September 9, 2020, the institutional quarantine status was lifted. All movement restrictions ceased and medical appointments resumed.

82) On or about September 1–4, 2020, Plaintiff submitted a Sick Call Request after using the prescribed Ammonium Lactate 12% Cream, as recommended

---

[16] See Plaintiff's clinical file on this date and compare to dates Mayo Correctional Institution was on quarantine.

by Defendant Solano, for an ample period of time. It was apparent to Plaintiff that the cream was failing to provide him any relief from the symptoms of his condition, e.g., intense itching, rash-like bumps, excoriated lesions, painful skin infections, and difficulty sleeping.

83) On September 15, 2020, Plaintiff was seen by Defendant Perry.[17]

    a. Without conducting an examination and without reviewing Plaintiff's medical history, Defendant Perry diagnosed Plaintiff with scabies and was prescribed similar medications for treatment (Permetherin Lotion, Ivermectim, Prednisone, antibiotics) that had already been prescribed numerous times in the past with no success.

    b. At that time, Plaintiff advised Defendant Perry how the previous treatments using the medications that she was going to prescribe have not been successful in bringing him relief.

84) After a few weeks passage of time, it was apparent to Plaintiff that his skin disease remained unresolved.

85) On October 16, 2020, Plaintiff was seen by care provider, R. Laubaugh, MD, hereinafter Defendant Laubaugh, and had two skin samples extracted for biopsy, one sample was extracted from his left lower-leg area and one was extracted from his thigh area.

---

[17] Sometime shortly after Plaintiff's appointment with Defendant Perry she was relieved of her duties at Mayo C.I.

86) On or about November 9–11, 2020, Plaintiff had an appointment with Defendant Laubaugh. The following occurred:

   a. Plaintiff was advised that there was no evidence of scabies found during biopsy.

   b. Plaintiff was prescribed four (4) separate doses of Ivermectin to be taken weekly.

87) On November 13, 2020, Plaintiff was transferred to Putnam Correctional Institution.

88) Within a few days of his arrival at Putnam C.I., Plaintiff began receiving the weekly doses of Ivermectin prescribed by Defendant Laubaugh.

89) On December 4, 2020, Jackie Westfall, DO, hereinafter Defendant Westfall, was the Medical Director over the medical department at Putnam Correctional Institution and the physician charged with providing medical care to inmates, saw Plaintiff for the first time for his skin disease.

   a. Plaintiff explained the history of his skin disease and how all the medications and treatments that were prescribed in the past did not help.

   b. Defendant Westfall insisted on going back through all previously prescribed treatments stating, "[y]ou are at Putnam now and we have to do everything over because we haven't tried them here. He then prescribed Triamcinolone Acetonide Cream USP, 0.01%, Prednisone, and possibly

antibiotics, while having knowledge, via medical records, that the medications failed to adequately treat or resolve Plaintiff's skin disease in the past.

c. In order for it not to be determined that he refused medical care, Plaintiff accepted and adhered to the prescribed courses of treatment that Defendant Westfall prescribed even though Plaintiff knew, as it had already been proven throughout the history of his skin disease, that they would not be successful in the treatment or resolution of his skin disease.

90) On December 7, 2020, Plaintiff completed the weekly doses of Ivermectin that was prescribed to him by Defendant Laubaugh while still at Mayo C.I.

91) As Plaintiff expected, the medication/treatments failed to resolve Plaintiff's serious skin disease and he continued to suffer intense itching, rash-like bumps, excoriated lesions, and infections that were causing discomfort and pain.

92) On January 5, 2021, Plaintiff was seen by Defendant Westfall. A skin scraping test was ordered to be conducted.

93) Later on that same day, January 5, 2021, Putnam Correctional Institution went on quarantine status.

94) On or about January 12, 2021, Plaintiff was escorted from his dormitory to the medical department due to the institutional quarantine status, was seen by

Defendant Westfall, and a skin scraping test was performed.

   a. Defendant Westfall performed the skin scraping; he cut Plaintiff and concluded the skin scraping at the site of blood, and only wiped Plaintiff's blood on the inside of the sample cup and sent it off for laboratory testing.

95) On January 27, 2021, Plaintiff submitted a Sick Call Request complaining of skin infections located on his buttocks and leg that were causing him discomfort, severe pain, an inability to sit down properly, and difficulty walking.

96) On January 28, 2021, the nurse-on-duty went to the dormitory where Plaintiff was housed/assigned due to the institution's quarantine status to follow-up on the Sick Call Request he submitted. The nurse examined Plaintiff's skin infections and advised that antibiotics would be prescribed. Plaintiff began receiving antibiotics after a day or two.

97) On February 2, 2021, Plaintiff was seen by Defendant Westfall. Plaintiff was informed that the skin scraping test results came back negative for any organic matter, just as Plaintiff expected due to the reckless manner in which the skin scraping was performed.

   a. Defendant Westfall prescribed that I continue taking the antibiotics and additionally prescribed Prednisone and an antibiotic injection twice a day for a week.

98) On February 16, 2021, Defendant Westfall prescribed Plaintiff Ivermectin and possibly Triamcinolone Acetonide Cream USP, 0.01% and was advised to continue taking the Prednisone medication.

99) On or about February 17, 2021, Plaintiff submitted a Sick Call Request in regards to his diminishing eye sight.

100) On February 19, 2021, Plaintiff was provided one tube of Permetherin Lotion as treatment for his skin disease.

101) On February 23, 2021, Defendant Westfall prescribed Plaintiff Ivermectin and Permetherin Cream to be taken as follows:

    i.    February 24, 2021, 1 dose of Ivermectin; 1 tube of Permetherin Lotion
    ii.    February 25, 2021, 1 dose of Ivermectin
    iii.    February 26, 2021, 1 tube of Permetherin Lotion
    iv.    March 1, 2021, 1 tube of Permetherin Lotion
    v.    March 3, 2021, 1 dose of Ivermectin; 1 tube of Permetherin Lotion
    vi.    March 4, 2021, 1 dose of Ivermectin
    vii.    March 5, 2021, 1 tube of Permetherin Lotion
    viii.    March 9, 2021, 1 tube of Permetherin Lotion
    ix.    March 10, 2021, 1 dose of Ivermectin

102) On March 8, 2021, Plaintiff had an appointment with an Optometrist. It was determined that Plaintiff was near sighted and would need eye glasses.

103) On March 16, 2021, Plaintiff had a follow-up appointment with Defendant Westfall. The following occurred during the appointment:

a. Plaintiff showed Defendant Westfall that the symptoms of his skin disease persisted.

27

b. Defendant Westfall prescribed Plaintiff Ketoconazole Cream to apply to the affected areas daily and Fluconazole to be taken orally two times daily for 14 days.

c. Plaintiff advised that these medications were not helpful the previous time that they were prescribed for treatment.

104) While following all Defendant Westfall's prescribed treatment orders, Plaintiff's skin disease continued on in its progression, causing him to suffer from intense itching, wart-like bumps, sores, atrophy, infections, pain, and severe scarring and disfigurement of the skin.

105) Also, sometime during the period of time –January thru March 30, 2021– Defendant Westfall prescribed Plaintiff Clobetasol Propionate Ointment, USP 0.05%.

106) On March 30, 2021, Plaintiff had a follow-up appointment with Defendant Westfall for his skin disease. The following occurred during the follow-up appointment:

a. Plaintiff complained to Defendant Westfall that he was still suffering from the symptoms of his skin disease.

b. Defendant Westfall stated to Plaintiff, "I am not a dermatologist. There is nothing more that I can do to treat your skin disease. I am going to refer you to a dermatologist."

28

107) On May 3, 2021, Plaintiff submitted a Sick Call Request to access medical staff to inquire into the status of his Consultation Request.

108) Later that same day, Plaintiff was seen by the sick call nurse on duty, Nurse D. Richardson.

    a. Nurse D. Richardson informed Plaintiff during the appointment that his specialist appointment had not yet been approved.

109) On May 4, 2021, Plaintiff was called to the medical department and was asked to sign a *second* Consultation Request.

110) On May 5, 2021, Plaintiff was called to the medical department and was seen by the nurses-on-duty.

    a. The nurses informed Plaintiff that they needed to photograph different of areas of his skin so that they could be submitted along with the specialist Consultation Request for approval.

    b. Lieutenant Mosier used his Smartphone to take these photographs.

111) After the appointment with the nurses on May 6, 2021, Plaintiff began receiving a prescription of medication, Doxycycline, without being seen by the physician/care provider (Defendant Westfall).

112) On May 21, 2021, Plaintiff was seen by Defendant Westfall. During the appointment the following occurred:

    a. Plaintiff was informed that the Consultation Request was not approved.

Instead, an 'eConsult A-jMGMz' was conducted through Rubicon MD, Specialist ID:3vgk.[18]

b. Specialist ID:3vgk, responded in writing, "I would try oral antibiotics [Doxycycline] and see how he does and follow up in 3 months."

c. Plaintiff complained to Defendant Westfall that the recommendation for treatment was the same treatment that has been prescribed multiple times in the past, and of no help in resolving his skin disease.

d. Defendant Westfall adhered to the treatment recommendation suggested through the 'eConsult' and continued the already prescribed Doxycycline for a total combined period of one month that began on the evening of May 6, 2021.

e. Defendant Westfall asked Plaintiff to sign a *third* Consultation Request.

113) On May 26, 2021, Plaintiff submitted an institutional level Formal Grievance in regards to being denied access to a specialist for an in-person consultation for examination.

114) On June 5, 2021, Plaintiff completed the Doxycycline medication as prescribed. Plaintiff's skin disease remained unresolved.

115) On June 6, 2021, Plaintiff's institutional level Formal Grievance was returned approved. The following response was provided:

---

[18] Note that RubiconMD is an information service and does not provide medical diagnosis or treatment.

> "A second consultation has been submitted to Utilization Management for referral to see the Dermatologist. A final decision on how to proceed with your skin condition is pending. Based on the above, your request for administrative remedy is approved in the fact that a second consultation has been submitted."

116) On July 14, 2021, Plaintiff was scheduled an appointment with the nurse on duty. On that day the following occurred:

    a. Nurse M. McAloose asked Plaintiff to sign a *fourth* Consultation Request.

    b. Plaintiff asked Nurse M. McAloose what had happened to the *third* Consultation Request.

    c. Nurse M. McAloose stated, "I don't know."

    d. Plaintiff, desperate to see a specialist, signed the *fourth* Consultation Request.

117) On July 16, 2021, Plaintiff submitted a Sick Call Request to seek medical care for the treatment of itching, excoriated lesions, infections, burning sensations, and pain by placing the Sick Call Request in the secured locked box located just outside of the institutions' dining hall.

118) On July 19, 2021, Plaintiff submitted an Emergency Direct Grievance to the Secretary of the Florida Department of Corrections. In the grievance, he complained of the prolonged delay in access to an appointment with a specialist for an in-person examination, diagnosis, and for the treatment of his

skin disease that was causing intense itching, atrophy, wart-like bumps, open sores, infections, pain and suffering, hair loss, and severe scarring and disfigurement of the skin, to include his face.[19]

119) On July 26, 2021, Plaintiff received a notice from the Bureau of Grievances, which informed that his Emergency Direct Grievance was "not accepted as an emergency" and that "appropriate action will be taken with regards to the grievance submitted and a response will be provided to you."[20]

120) On July 27, 2021, Plaintiff submitted an institutional level Formal Grievance regarding the prolonged delay of access to an in-person consultation with a specialist, examination, diagnosis, and for the treatment of his skin disease.[21]

121) On July 29, 2021, Plaintiff submitted a Sick Call Request to seek medical care for the treatment of itching, large excoriated lesions, infections, burning sensations, and pain by placing the Sick Call Request in the secured box located just outside of the institutions' dining hall entrance.[22]

122) Also on July 29, 2021, Plaintiff submitted an Inmate Request to the Medical

---

[19] A Direct Emergency Grievance- can be filed directly to the Secretary of the Department of Corrections if it involves a matter, which, if disposed of according to the regular time frames, would subject the inmate to substantial risk of personal injury or cause other serious and irreparable harm to the inmate.

[20] The Direct Grievance was not treated as an emergency but instead was treated improperly as an appeal from approved grievance, log # 2105-214-011.

[21] See Formal Grievance, log # 2107-214-010

[22] Plaintiff's submittal of the Sick Call Request was witnessed by inmate Shawn Ashe, DC# J22330, as he was directly behind Plaintiff in line for breakfast. (See statement of Shawn Ashe documented in his General Affidavit)

Department asking to be provided photocopies of specific medical documents as part of his pre-suit investigation into potential medical negligence litigation.

123) On August 4, 2021, Plaintiff submitted an institutional level Formal Grievance in regards to being denied access to medical care via the Sick Call Request submitted on July 29, 2021.[23]

124) On August 9, 2021, Plaintiff submitted another Inmate Request to the medical Department asking to be provided photocopies of additional specific medical documents.

125) Also On August 9, 2021, Plaintiff had a consultation with a specialist but it was not an in-person consultation. It was conducted via telehealth services.

126) Just prior to the consultation with the specialist, Plaintiff questioned medical staff about the use of telehealth services for dermatology.

127) Medical staff advised that if he did not agree to the telehealth services consultation that he would not be seeing the specialist at all.

128) The following occurred during the telehealth services consultation with the specialist:

a. Defendant Solano did not conduct a complete close-up examination of Plaintiff's skin disease, only a cursory examination was conducted through

---

[23] See Formal Grievance, log # 2108-214-003.

a webcam (telehealth services) of two large lesions; one large lesion was located on Plaintiffs' right-front midriff area and the other was located just above his right knee.

b. Plaintiff's medical records were not available to Defendant Solano for review. Instead, he relied on Plaintiff's memory exclusively to provide him the medical history.

c. Defendant Solano recommended that Plaintiff be prescribed Neurontin. Also Doxepin was recommended.

d. Defendant Solano did not perform any diagnostic testing nor did he order any diagnostic testing to be performed.

129) Also on August 9, 2021, a response was provided to Plaintiff's institutional level Formal Grievance regarding the prolonged delay of access to an in-person consultation with a specialist, examination, diagnosis, and for the treatment of his skin disease. The following response was provided:

> "The Medical Department has aggressively tried to take care of your skin condition and after not getting better, the Medical Team worked hard to advance your care to a specialist for your skin condition. The skin consultation is approved. The specialist schedules your appointment and it will be soon."

130) On August 15, 2021, Plaintiff submitted an Inmate Request informing Ms. Swaggerty, the administrative assistant, that he still wanted the photocopies he requested.

131) On August 15, 2021, Plaintiff submitted a Sick Call Request asking to see the physician so that he could find out what the specialist had diagnosed him with and what had been recommended for the treatment of his skin disease.

132) On August 16, 2021, Plaintiff's Direct Grievance, log #21-6-20687, submitted to the Secretary of the Department of Corrections was denied.[24] The following reasons for denial were stated:

> "It is the responsibility of your health care staff to determine the appropriate treatment regimen for the condition you are experiencing, including specialty consultations. It is determined that the response made to you by the physician on 6/7/2021 appropriately addresses the issues you presented. Records reviewed indicate that you are scheduled to be seen by the dermatologist soon, where you can address your medical concerns at that time.[25] Should you experience problems, sick call is available so that you may present your concerns to your health care staff."[26]

133) On August 17, 2021, Plaintiff was seen by the Sick Call nurse. The following occurred during the appointment:

a. Upon arrival, Nurse Roberts asked Plaintiff to sign a Consultation Request.[27]

---

[24] See Direct Grievance Response, log # 21-6-20687.

[25] Note that the Response is dated one week after Plaintiff's telehealth services consultation with the specialist on August 9, 2021.

[26] Note that Sick Call Requests were submitted on July 16, 2021 and July 29, 2021, and were not met with a response.

[27] The Consultation Request was for a follow-up with Defendant Solano in six months as he had recommended.

b. Plaintiff advised that he did not request to be seen so that he could sign a Consultation Request. He advised that he requested to be seen by the physician to go over the specialist's diagnosis and recommendation.

c. Nurse Roberts briefly reviewed Plaintiff's medical records and became aware that no follow-up with the physician had been scheduled and that the specialist's medication recommendation, Neurontin and Doxepin, had not yet been prescribed.

d. Nurse Roberts then stated, in question, "[S]o you haven't received any medications yet?"

e. Plaintiff stated, "No."

f. Nurse Roberts forwarded Plaintiff for an immediate, same day appointment with the physician (Defendant Westfall).

134) On August 17, 2021, after being forwarded to see the care provider by the nurse, Plaintiff was seen by Defendant Westfall to go over the diagnosis and recommendation made by the specialist. The following occurred during the appointment:

a. Defendant Westfall informed Plaintiff that the specialist diagnosed his skin disease as Neurodermatitis;

b. Defendant Westfall informed Plaintiff of the medications (Neurontin and Doxepin) that were recommended by the specialist and that the Neurontin

medication was not approved for prescribing to him, no explanation was provided;

c. Defendant Westfall prescribed Doxepin to Plaintiff and advised that he would have a follow-up with him in a month;

d. Defendant Westfall asked Plaintiff to sign another Consultation Request (*fifth request*) for the follow-up appointment with the specialist in six months.

135) On August 18, 2021, Plaintiff signed an Inmate Payment Agreement for the photocopies he requested, thereby agreeing for the costs of the requested photocopies of medical documents to be deducted from his inmate trust account.

136) Also on August 18, 2021, Plaintiff's institutional level Formal Grievance regarding being denied access to medical care via Sick Call Request was returned denied. The following response was provided:

> "You received ongoing treatment for your skin condition appropriately and seen a specialist for your skin condition. The secured sick call box did not have your sick call request that you claimed and there was no declared medical emergency."

137) Also on August 18, 2021, Plaintiff submitted an institutional level Formal Grievance in regards to not receiving adequate medical care during the appointment with Dr. Solano, the specialist, for the reasons stated above in

*Statement of Facts, paragraph 126(a-d).*[28]

138) On August 26, 2021, Plaintiff submitted an Appeal to the Secretary of the Florida Department of Corrections from the denial of his institutional level Formal Grievance in regards to not being provided access to medical care via Sick Call Request.[29]

139) Also on August 31, 2021, Plaintiff's institutional level Formal Grievance regarding not being provided adequate medical care during the telehealth services consultation with the specialist was returned denied.[30] The responding employee stated the following:

> "The medication, Doxepin was ordered for your diagnoses and requires adequate time to work as prescribed by the specialist. You will have a follow up with the specialist in the near future" [Approximately in February]. Based on the above your grievance is denied."

140) Also on September 5, 2021, Plaintiff submitted an Appeal to the Secretary of the Florida Department of Corrections from the denial of his institutional level Formal Grievance in regards to not being provided adequate medical care during a consultation with Dr. Solano.[31]

141) On September 17, 2021, Plaintiff became aware that the medical director and

---

[28] See Formal Grievance, log # 2108-214-019.

[29] See Grievance Appeal, log # 21-6-25502.

[30] See Part B – Response to Formal Grievance, log # 2108-214-109.

[31] See Grievance Appeal, log # 21-6-27305

licensed treating physician at Putnam Correctional Institution took a leave of absence due to a personal undisclosed medical issue.

142) On September 17, 2021, Plaintiff had a follow-up appointment with the care provider. Plaintiff was seen by a different care provider, L. Dawson, ARNP, hereinafter Defendant Dawson.

143) At the time of the appointment with Defendant Dawson, Plaintiff's skin disease was not improved since his consultation with the specialist on August 9, 2021, his last appointment with Dr. Westfall on August 17, 2021, or since taking medication (Doxepin) as recommended by the specialist, which began on August 19, 2021. The following occurred during the appointment which resulted in inadequate health care for treatment of a serious and chronic skin disease:

   a. Plaintiff showed her several irritated areas of his skin which had numerous bumps, inflammation, several excoriated lesions, and painful infections. Defendant Dawson advised that she was going to prescribe antibiotics, Doxycycline;

   b. Plaintiff then informed her that Doxycycline does not help improve his condition at all. Medical records will show that this medication has been prescribed numerous times in the past and that it did not have a positive effect to Plaintiff's many skin infections or to any of the other symptoms of

his skin disease;

c. Plaintiff also advised that he has had this problem for about 4 and a half years now and Defendant Dawson responded by stating, "[y]eah, and you will likely have it until you leave here (meaning prison);

d. Plaintiff also informed Defendant Dawson that he was taking the medication Doxepin as recommended by the specialist for 4 weeks now and that it was not helping to improve his skin disease and that it was only causing him to have blurred vision and behavioral issues, e.g., confusion, irritability, and agitation. As shown by no adjustments or changes being made, she did not make any consideration to these facts;

e. Finally, Defendant Dawson stated, "Dr. Westfall has submitted a specialist consult request already." I then informed her that it was for a follow-up with the specialist in February [2022] as the specialist had recommended but that "I needed help now." Defendant Dawson then concluded the appointment by stating, "[W]e are done here."

144) On September 21, 2021. Plaintiff submitted an institutional level Formal Grievance in regards to not receiving adequate medical care during the appointment with Defendant Dawson on September 17, 2021.[32]

145) On October 1, 2021, Plaintiff's institutional level Formal Grievance regarding

---

[32] Formal Grievance, log # 2109-214-018.

not being provided adequate medical care during his appointment On September 17, 2021, was returned denied. The responding employee stated the following:

> "Management of your chronic dermatitis is appropriate. The medical team ongoing care handles you with great concern and care."

146) On October 5, 2021, Plaintiff submitted an Appeal to the Secretary of the Florida Department of Corrections from the denial of his institutional level Formal Grievance, log # 2109-214-018, in regards to not being provided adequate medical care during his appointment on September 17, 2021.

147) On October 9, 2021, Plaintiff's Appeal to the Secretary of the Florida Department of Corrections from the denial of his institutional level Formal Grievance in regards to not being provided access to medical care via Sick Call Request was returned denied.[33]

148) On October 14, 2021, Plaintiff was seen by Defendant Dawson for a follow-up of his skin disease. The following occurred:

a. Plaintiff showed that he still had several excoriated lesions, painful infections, inflammation, rash-like bumps, wart-like bumps, and informed her that he is still intensely itchy and having difficulty sleeping.

b. Plaintiff again advised that the medication (Doxepin) he was prescribed

---

[33] See Grievance Appeal, log # 21-6-25502.

was not helping to improve his condition and that it was only causing him behavioral issues.

c. Plaintiff asked for his prescribed medications to be changed or discontinued all together.

d. Defendant Dawson then stated, "[y]ou have a follow-up consultation with the specialist scheduled. You can ask him to do that."

e. Plaintiff asked for a sooner follow-up appointment with the specialist, as he was not currently scheduled for a follow-up until sometime in February 2022 (3+ months away).

f. Bacitracin Antibiotic Ointment was prescribed, an-over-the-counter type medication that will not prevent Plaintiff's continued suffering of intense itching, rash-like bumps, wart-like bumps, excoriated lesions, painful skin infections, severe scarring of the skin, and difficulty sleeping.

g. No referral was made to advance Plaintiff's care to a licensed physician and no follow-up appointment was scheduled.

149) On October 14, 2021, Plaintiff's Appeal to the Secretary of the Florida Department of Corrections from the denial of his institutional level Formal Grievance in regarding the specialist's negligence when making his recommendation was returned denied. The following reasons were stated:

> "It is the responsibility of your health care staff to determine the appropriate treatment regimen for the

> condition you are experiencing. Records reviewed indicate that you are scheduled to be seen by the Physician soon, where you could address your medical concerns at that time. Should you experience problems, sick call is available so that you may present your concerns to your health care staff."

150) By October 19, 2021, Plaintiff still had not received the photocopies of specific medical documents he requested from the medical department on July 29, 2021, and August 9, 2021, even after all requirements in obtaining the photocopies of the requested documents were met.

151) On October 19, 2021, Plaintiff formally gave notice of his intent to initiate medical malpractice litigation by mailing a copy by U.S. Certified Mail–Return Receipt Requested– to Party Centurion of Florida, LLC, and listed all prospective Defendants/employees of Defendant Centurion and included an Authorization for Release of Protected Health Information; listing all **known** care providers who have examined, evaluated, or treated Plaintiff.

152) On October 22, 2021, Plaintiff spoke with Ms. Anderson, Grievance Coordinator, about Defendant Dawson acting as a licensed physician when she, without authority to do so, responds to Formal Grievances in violation of F.A.C. 33-103.008(1). She agreed that the rule specifically explains that the responding employee must be either the Chief Health Officer or a licensed physician.

153) On November 5, 2021, Plaintiff learned that Putnam Correctional Institution's

medical department was brought back into compliance; operating in accordance with Florida Law and the staffing requirements of the negotiated contract with the Florida Department of Corrections

154) On November 15, 2021, Plaintiff submitted an institutional level informal grievance because he still had not received the photocopies of the medical documents he requested after meeting all requirements.

155) On November 19, 2021, Plaintiff's Appeal to the Secretary of the Florida Department of Corrections from the denial of his institutional level Formal Grievance regarding the failure to provide adequate health care during an appointment on September 17, 2021 with Defendant Dawson was returned without action.[34]  The following reason was stated:

> "The grievance presents the same issue as grievance appeal # 21-6-27305. Per Rule 33-103, grievances may be returned to the inmate without further processing if the inmate has filed more than one appeal of grievances. You are advised that the filing of multiple grievances regarding the same issue will only impede the inmate grievance procedure, not hasten a reply."[35]

156) On November, 22, 2021, Plaintiff's institutional level formal grievance regarding not being provided with photocopies of medical documents he requested on July 29, 2021, and August 9, 2021, was returned approved.

---

[34] See Grievance Appeal, log # 21-6-30978.

[35] Note that Appeal, log # 21-6-27305 was a different issue presented on appeal from the denial of Formal Grievance, log # 21-6-30978, regarding as it was in regards to inadequate medical care during Plaintiff's consultation with the specialist on August 9, 2021.

157) Plaintiff received the requested photocopies within the next couple of days.

158) On December 12, 2021, Plaintiff submitted a Sick Call Request by placing the Sick Call Request in the secured locked box located just outside of the institutions' dining hall.

159) Plaintiff required medical care because he had not had a follow-up with a care provider since October 14, 2021, and because the medication (Doxepin) he was taking as prescribed was not helping to resolve his skin disease or prevent irritation, inflammation, the continued development of bumps, excoriated lesions, and painful skin infections.

160) On December 15, 2021, Plaintiff had an appointment with the sick call nurse-on-duty and after discussion about his current condition and about the ineffectiveness of the medication he was currently prescribed, Nurse Rice submitted a referral for the physician.

161) On December 28, 2021, Plaintiff was seen by Defendant Westfall. After discussion regarding his prescribed medication and its failure to prevent irritation, inflammation, the continued development of bumps, excoriated lesions, and painful skin infections; after explanation of his appointments with only a nurse practitioner while he [Defendant Westfall] was on a leave of absence and the nurse practitioner's [Defendant Dawson] subsequent failure to refer Plaintiff to a physician or a specialist for care of his unstable chronic

skin disease, Defendant Westfall advised that he was going to submit a Consultation Request.

162) Plaintiff then brought up the fact that the last appointment with the specialist was conducted through telehealth services and that no physical examination was done prior to diagnosis and recommendations for treatment being made.

163) Defendant Westfall advised that he was going to specifically request for the consultation to be conducted in-person with the specialist.

164) On January 21, 2022, Plaintiff received correspondence from Brian A. Wahl, attorney for Centurion of Florida, LLC, arguing that Plaintiff failed to comply with the per-suit investigation and notice requirements outlined in § 766.106 Florida Statute.

165) Plaintiff ascertains that he has met the pre-suit requirements as mandated by § 766.106. Florida Statute.

166) On January 24, 2022, Plaintiff filed his Civil Rights Complaint, 42 U.S.C § 1983, for violations of his Eighth Amendment right to adequate medical care under the United States Constitution. Plaintiff is also asking this Honorable Court to exercise its supplemental jurisdiction over the included State Law Claims asserted herein.

167) Defendant Centurion is the private vendor contracted by the Florida Department of Corrections to supply the staff who provide treatment/care at

all of FDC facilities, coordinates the care of inmates who must receive specialist or hospital services outside the facility, and manages the overall system of care through a system of regional administration, quality assurance, and utilization management.

168) The contract is structured in a "cost plus" model. The vendor receives compensation in two components: 1) reimbursements for all approved health care expenditures; and 2) a percentage of actual expenses to cover administrative expenses and profit. In effect, the contract passes through the cost of incurred health care expenses to Defendant Centurion, which receives an administrative fee for administering the program. The administrative fee in the current contract is 11.5 percent of incurred expenses.

169) The contract contains an overall annual cap on compensation paid out under the contract. The current compensation cap is $421 million per fiscal year.

170) The contract is "out-come" based in that Defendant Centurion is held accountable through its level of achievement on a series of performance measures detailed in the contract. Defendant Centurion reports on their compliance with these performance measures quarterly. The level of compliance with performance measure requirements determines whether any financial penalties may be assessed against Defendant Centurion.

171) While Defendant Centurion is reimbursed for actual expenses incurred, it may

be subject to financial penalties if mandated outcomes are not achieved.

172) Defendant Centurion was deliberately indifferent to Plaintiff's serious medical needs by maintaining policies, customs, directives, or practices pursuant to which inmates with serious medical needs were routinely denied adequate medical care.

173) Defendant Centurion prioritizes profits over care of inmates, fails to ensure a continuity of care for its patients, fails to ensure adequate staffing, refuses to provide proper treatment for difficult patients, and refuses to send patients to outside facilities.

174) Defendant Centurion's policies, customs, directives, or practices directs their employees to ignore obvious symptoms of serious medical conditions and to provide cursory medical care for the lesser, non-life threatening medical conditions.


## CLAIMS

175) Plaintiff relies on the above asserted facts in paragraphs 1-174 as well as the following facts asserted in paragraphs 176-477 in support of all his claims.

176) **Defendant Centurion was deliberately indifferent to Plaintiff's medical needs when it denied and/or delayed Plaintiff access to a specialist for care of a serious medical condition in violation of the Eighth Amendment of the U.S. Constitution.**

177) Approximately September 2018, after numerous employees of Defendant Centurion were unable to provide the level of medical care Plaintiff required for treatment of a serious medical condition during the previous 17 months, Defendant Jenkins determined that Plaintiff required a level of medical care that was not available at the institution where Plaintiff was assigned.

178) Approximately September 2018, Defendant Jenkins informed Plaintiff that she was going to refer him to a specialist by submitting a Consultation Request.

179) Defendant Centurion employs a Utilization Management team that reviews all requests for specialty consults and approves or denies them based on necessity and cost.

180) On October 15, 2018, Defendant Jenkins informed Plaintiff that the Consultation Request had not been approved by Utilization Management. No medical related explanation for the denial was provided to Plaintiff.

181) During the period of time –October 15, 2018, thru October 14, 2019– instead of Defendant Centurion providing Plaintiff access to a specialist for the care he required, numerous employees of Defendant Centurion repeatedly prescribed inappropriate/inadequate medications as easier and less efficacious courses of treatments. *See Statement of Facts, paragraphs 25; 32; 38; 39; 40; 42(c); 44(d);49; 50.*

182) The continuous prescribing of inappropriate/inadequate medications as easier and less efficacious courses of treatments from October 15, 2018, thru October 14, 2019, instead of providing Plaintiff access to a specialist was the direct cause of the progression of Plaintiff's skin disease and his continued suffering from intense itching, rash-like bumps, excoriated lesions, painful skin infections, severe scarring of the skin, difficulty sleeping, humiliation, severe depression, stress, and the feeling of hopelessness.

183) Then, after suffering for a prolonged period of time and after several medical emergency declarations being made, Plaintiff finally gained access to a specialist for a brief series of consults that began on October 14, 2019.

184) After the treatment recommendations of the specialist failed to resolve or control the symptoms of Plaintiff's skin disease, beginning on September 15, 2020, thru March 29, 2021, similar medications, e.g., Permetherin Lotion, Ivermectin, Prednisone, Triamcinolone, etc., which had already proved to be inappropriate/inadequate, were prescribed to Plaintiff instead of submitting Consultation Requests to advance Plaintiff's care back to the level care he required. *See Statement of Facts, paragraphs* 83(a); 86(b); 89(b); 96; 97; 98; 100; 101(i-ix); 103(b); 105.

185) After repeating all similar treatment regimens that had already proven ineffective in the past, on March 30, 2021, Defendant Westfall determined that

"there was nothing more that he could do to treat Plaintiff's skin disease" and said that "he was going to submit a Consultation Request for specialty care." Plaintiff signed a Consultation Request before leaving his office that day.

186) On May 3, 2021, Plaintiff submitted a Sick Call Request by placing it in the designated secured sick call box, which is located just outside of the institutions' dining hall, in order to gain access to medical staff to inquire into the status of the Consultation Request that he signed on March 30, 2021.

187) On May 4, 2021, in response to the Sick Call Request that he submitted on May 3, 2021, Plaintiff was called to the medical department and was advised by Nurse Richardson that his Consultation Request had not yet been approved.[36]

188) On May 5, 2021, Plaintiff was called back to the medical department and was asked to sign a *second* Consultation Request.[37]

189) The very next day, May 6, 2021, Plaintiff was called back to medical so that photographs could be taken of his skin disease.

190) On May 21, 2021, Plaintiff was scheduled for an appointment with Defendant Westfall. Defendant Westfall informed Plaintiff that the Consultation Request he submitted was not approved for an in-person consultation with a specialist.

---

[36] Note that the Sick Call Request submitted by Plaintiff on May 3, 2021 could not be located within his medical files.

[37] Note that the second Consultation Request Plaintiff signed on May 5, 2021 could not be located in clinical files.

191) Instead, an 'eConsult' was conducted through Rubicon MD, Specialist ID:3vgk, and resulted in inadequate medical care. *See Statement of Facts, paragraph 112.*

192) On that same day, Defendant Westfall asked Plaintiff to sign another Consultation Request.[38]

193) On July 14, 2021, Plaintiff was scheduled an appointment with the nurse-on-duty. Nurse M. McAloose asked Plaintiff to sign another Consultation Request.[39]

194) It wasn't until after Plaintiff submitted three (2) separate Formal Grievances and one (1) Direct Grievance in regards to being denied access and/or delayed access to a specialist before he was provided access to a specialist.[40]

195) On August 9, 2021, Plaintiff finally had a consultation with a specialist but it was conducted via telehealth services; No physical examination, no review of medical records, and no diagnostic testing performed or ordered prior to a recommendation for treatment being made.

196) During the period of time –September 15, 2020 thru June 5, 2021– Plaintiff was repeatedly prescribed inappropriate/inadequate medications as easier, and less efficacious courses of treatments which caused him to continue to suffer

---

[38] This was the ***third Consultation Request*** that Plaintiff signed.

[39] This was the ***fourth Consultation Request*** that Plaintiff signed.

[40] Formal Grievance, log # 2105-214-011; Formal Grievance, log # 2107-214-010; Direct Grievance, log # 21-6-20687

from intense itching, rash-like bumps, puss-filled blisters, atrophy, excoriated lesions, painful skin infections, severe scarring and disfigurement of the skin, difficulty sleeping, humiliation, depression, stress, and the feeling of hopelessness. *See Statement of Facts, Paragraphs 83(a); 86(b); 89(b); 96; 97; 98; 100; 101(i-ix); 103(b); 105; 111; 112(d).*

197) During the period of time –June 5, 2021 thru August 19, 2021– Plaintiff was not receiving any medications.

198) The continued use of inappropriate/inadequate medications for care of his skin disease instead of providing Plaintiff with continuity of access to a specialist caused Plaintiff to continue suffering from intense itching, rash-like bumps, puss-filled blisters, atrophy, excoriated lesions, painful skin infections, severe scarring and disfigurement of the skin, difficulty sleeping, humiliation, depression, stress, and the feeling of hopelessness.

199) Defendant Centurion's policies, customs, directives, or practices were implemented in order to contain the rising costs of inmate health care and to keep from exceeding FDC negotiated contract limits in order to maximize their profits.

200) Defendant Centurion's policies, customs, directives, or practices caused the denial of the Consultation Requests and the unnecessary, prolonged delay in providing the level of medical care Plaintiff required.

201) Defendant Centurion's policies, customs, directives, or practices was the moving force behind the denial of the Consultation Requests and the delay in providing the level of care Plaintiff required; depriving him of adequate medical care in violation of Eighth Amendment of the U.S. Constitution.

202) At all relevant times, Plaintiff was suffering from a chronic and unstable skin disease at the time prior to and when his Consultation Requests were denied by Defendant Centurion and/or when Defendant Centurion delayed him access to specialty medical care.

203) The denial of the Consultation Requests and/or the delay in access to specialty medical care effectuated Plaintiff's continued suffering from symptoms that were affecting his entire body, causing him intense itching, rash-like bumps, puss-filled blisters, atrophy, excoriated lesions, painful skin infections, severe scarring and disfigurement of the skin, difficulty sleeping, humiliation, depression, stress, and the feeling of hopelessness.

204) Plaintiff suffered substantial and irreparable bodily harm in violation of the Eighth Amendment of the U.S. Constitution.

205) Plaintiff fully exhausted his administrative remedies in that he submitted an institutional level Formal Grievance regarding inadequate medical care and a total of <u>four</u> separate institutional level Formal Grievances regarding the

denial and/or the prolonged delay in providing access to a specialist.[41]

206) Plaintiff formally served his Notice of Intent to Initiate Medical Negligence Litigation on Defendant Centurion on October 19, 2021.

207) **Defendant Jenkins was deliberately indifferent to Plaintiff's serious medical needs in violation of the Eighth Amendment and/or committed medical negligence in violation of § 766.102 of the Florida Statutes for failing to submit another Consultation Request after an earlier request was denied and insisted to only prescribe inadequate/inappropriate medications for treatment for a serious medical condition.**

208) On October 15, 2018, Plaintiff was informed that the Consultation Request for specialty care submitted by Defendant Jenkins on or about September 2018, was denied.

209) Defendant Jenkins had already previously determined that Plaintiff required a level of care beyond her level of expertise when she had submitted a Consultation Request for specialty care on behalf of Plaintiff.

210) Plaintiff asked for an explanation but no medical explanation for the denial was given.

211) Plaintiff then asked Defendant Jenkins to submit another Consultation Request.

---

[41] Formal Grievance, log # 2002-209-130; Grievance Appeal, log # 20-6-12057; Formal Grievance, log # 2005-216-029; Grievance Appeal, log # 20-6-18999; Formal Grievance, log # 2105-214-011; Formal Grievance, log # 2107-214-010; Direct Grievance, log # 21-6-20687

212) Defendant Jenkins refused to submit another Consultation Request.

213) At the relevant times, Defendant Jenkins was acting within the scope of her duties as employee of Centurion of Florida, LLC.

214) Plaintiff's health care needs required a specialist's care for a serious medical condition in order to achieve an accurate diagnosis of his skin disease so that an appropriate treatment regimen could be prescribed to prevent further suffering and substantial and irreparable bodily harm.

215) Defendant Jenkins, committed medical negligence when she failed to have and use the knowledge, skill, and care ordinarily possessed and employed by members of the profession in good standing after being informed that the Consultation Request she submitted on behalf of Plaintiff was denied.

216) Defendant Jenkins failed to submit another Consultation Request while having the knowledge that Plaintiff required care not available at Taylor Correctional Institution.

217) Defendant Jenkins had a duty to provide a level of care or to make the necessary referrals to get Plaintiff the level of medical care he required elsewhere for treatment of a serious medical condition, but did not.

218) Instead of submitting another Consultation Request on behalf of Plaintiff, Defendant Jenkins prescribed Plaintiff Ivermectin medication while having knowledge of its ineffectiveness in treating his serious skin disease. *See*

*Statement of Facts, paragraph 25.*

219) Defendant Jenkins had already previously determined that Plaintiff required a level of care beyond her level of expertise when she had submitted a Consultation Request for specialty care on behalf of Plaintiff.

220) The injuries that Plaintiff sustained and his continued suffering from all the symptoms of his skin disease was the direct result of not receiving the medical care he required from a specialist; e.g., misdiagnosis and prescribing medication that had already proved to be inappropriate and ineffective.

221) At all relevant times, Plaintiff had a serious medical condition requiring a specialist's care at the time he asked Defendant Jenkins to submit another Consultation Request on his behalf.

222) Defendant Jenkins neglected to acknowledge that Plaintiff required a level of care when she insisted to only prescribe inappropriate medications instead of submitting another Consultation Request for specialist care after Defendant Centurion denied the Consultation Request.

223) Defendant Jenkins was deliberately indifferent to Plaintiff's serious medical needs when she insisted to just provide medical care that was cursory, inadequate, and inappropriate.

224) The medical care Plaintiff received from Defendant Jenkins resulted in the continued progression of the disease and caused him to suffer from symptoms

that were affecting his entire body; causing intense itching, rash-like bumps, excoriated lesions, painful skin infections, severe scarring of the skin, difficulty sleeping, humiliation, depression, stress, and the feeling of hopelessness.

225) Defendant Jenkins was deliberately indifferent to Plaintiff's serious medical needs when she did not submit another Consultation Request while knowing that Plaintiff required a level of care provided by a specialist.

226) Defendant Jenkins deprived Plaintiff of adequate medical care in violation of the Eighth Amendment of the U.S. Constitution and/or Defendant Jenkins committed medical negligence in violation of § 766.102 of the Florida Statutes.

227) Plaintiff fully exhausted his administrative remedies in that he submitted a Formal Grievances regarding the prescribing of the same medications and/or treatments that continue to fail to resolve or control his skin disease.[42]

228) Plaintiff formally served his Notice of Intent to Initiate Medical Negligence Litigation on Defendant Jenkins on October 19, 2021

---

[42] See Formal Grievance, log # 1809-218-058; Grievance Appeal, log # 18-6-43011; Formal Grievance, log # 1902-402-011; Grievance Appeal, log # 19-6-08989.

229) **Defendant's Jenkins, Marius, Romulus, Bhadja, Wetterer were deliberately indifferent to Plaintiff's serious medical needs when they failed to provide Plaintiff adequate medical care and/or committed medical negligence in violation of the Eighth Amendment of the U.S. Constitution and/or § 766.102 of the Florida Statutes.**

230) During the period of time beginning after a Consultation Request for specialty care was denied by Defendant Centurion –October 15, 2018 thru October 14, 2019 (364 days)– Plaintiff continued to seek adequate medical care for relief from the symptoms of his skin disease; a serious medical condition.

231) During that period of time, Plaintiff was provided inappropriate/inadequate medical care, was repeatedly misdiagnosed, and was repeatedly prescribed easier and less efficacious courses of treatment which subjected Plaintiff to continuing substantial and irreparable bodily harm. *See Statement of Facts, paragraphs 25; 32; 38; 40; 42(c); 44(d);49; 50.*

232) On October 15, 2018, Defendant Jenkins diagnosed Plaintiff with scabies and prescribed Ivermectin for treatment.

233) On January 5, 2019, March 20, 2019, April 24, 2019, and May 5, 2019, Defendant Marius diagnosed Plaintiff with scabies infestation and prescribed medications for treatment.

234) During his appointments with Defendant Marius, Plaintiff informed him that the medications he was prescribing (Permetherin Lotion, Ivermectin, and

Triamcinolone Acetonide Ointment USP, 0.01%) have already proven in previous treatment regimens to be ineffective in reducing or limiting the symptoms of his skin disease.

235) Defendant Marius also prescribed Plaintiff Betamethasone Diproportionate Cream USP, 0.05%, another type of topical steroid cream; advising to apply topically to all affected areas twice daily.

236) On July 25, 2019, Plaintiff was seen by both Defendant Romulus and Defendant Bhadja. They both diagnosed Plaintiff with scabies infestation and medications for treatment were prescribed, e.g., Permetherin Lotion and Ivermectin.

237) Plaintiff informed Defendant Romulus and Defendant Bhadja that the medications he was being prescribed (Permetherin Lotion and Ivermectin) already proved in previous treatment regimens to be ineffective in reducing or limiting the symptoms of his skin disease.

238) Plaintiff was also seen on other occasions by Defendant Bhadja and was prescribed Betamethasone Diproportionate Cream USP, 0.05% and/or Triamcinolone Acetonide USP, 0.01% even after Plaintiff informed him that those types of topical medications were ineffective in reducing or limiting the symptoms of his skin disease.

239) On September 17, 2019, Plaintiff was seen by Defendant Wetterer. After

60

Defendant Wetterer diagnosed Plaintiff with scabies, Plaintiff informed him that the medication he was going to prescribe to him (Ivermectin) already proved in previous treatment regimens to be ineffective in reducing or limiting the symptoms of his skin disease.

240) Defendant Wetterer, ignored Plaintiff's revelations, the medical evidence documented in his medical records, and insisted to prescribe Ivermectin for treatment.

241) The medications and treatments that were continuously being prescribed to Plaintiff were not helping to provide him relief from intense itching, the continuing development of rash-like bumps, excoriated lesions, painful skin infections, severe scarring of the skin, difficulty sleeping, depression, and humiliation.

242) At all relevant times, Defendant's Jenkins, Marius, Bhadja, Romulus, and Wetterer were acting within the scope of their duties as employees of Centurion of Florida, LLC.

243) Defendant's Jenkins, Marius, Romulus, Bhadja, and Wetterer knowingly misdiagnosed Plaintiff with scabies.

244) Defendant's Jenkins, Marius, Romulus, Bhadja, and Wetterer knew or should have known that Plaintiff did not have scabies infestation but insisted to document that that is what Plaintiff's medical condition was.

245) Defendant's Jenkins, Marius, Romulus, Bhadja, and Wetterer prescribed the same or similar medications as treatment, while knowing that they have not been effective in the past, because it was the easiest way, and the cheapest way, to document that Plaintiff was being provided medical care for his serious medical condition–even though inadequate and less efficacious.

246) Defendant's Jenkins, Marius, Romulus, Bhadja, and Wetterer knew or should have known that the medications and treatments they were prescribing to Plaintiff for treatment of his skin disease were inappropriate/inadequate.

247) Defendant's Jenkins, Marius, Romulus, Bhadja, and Wetterer knew or should have known that the medications intended for effectively eradicating scabies infestation did not cure Plaintiff's skin disease in the past so they had to know or should have known that Plaintiff's skin disease was not scabies infestation.

248) Defendant's Jenkins, Marius, Romulus, Bhadja, and Wetterer knew or should have known, by their own observations, that the medications and/or treatments that were prescribed to Plaintiff were inappropriate/inadequate.

249) Defendant's Jenkins, Marius, Romulus, Bhadja, and Wetterer knew or should have known that the medications and/or treatments that were continuously being prescribed to Plaintiff were inadequate through the complaints Plaintiff made in institutional level formal grievances.

250) Defendant's Jenkins, Marius, Romulus, Bhadja, and Wetterer knew or should

have known that the medications and/or treatments that were continuously being prescribed to Plaintiff were inadequate by the history of Plaintiff's skin disease that was well documented in his medical records.

251) Defendant's Jenkins, Marius, Romulus, Bhadja, and Wetterer were deliberately indifferent to Plaintiff's serious medical needs when they insisted to only provide medical care to Plaintiff that was so grossly incompetent, cursory, and inadequate.

252) Defendant's Jenkins, Marius, Romulus, Bhadja, and Wetterer were negligent in their duties when they failed to use reasonable professional judgment or skill when making a diagnosis of Plaintiff's skin disease.

253) The visible symptoms of Plaintiff's skin disease did not resemble characteristics of scabies infestation but of some other type of chronic skin disease as; symptoms of his skin disease include any raised red skin in a line (representing burrows) and possibly blisters or pustules, he did not have bumps or burrows between the fingers, on the elbow crease, armpit, groin crease, or behind the knees.

254) Defendant's Marius, Romulus, Bhadja, and Wetterer neglected to acknowledge that Plaintiff required a level of care beyond their level of expertise and subsequently failed to submit a Consultation Request for specialty care at the earliest point of contact with Plaintiff.

255) Defendant's Marius, Romulus, Bhadja, and Wetterer's actions were undertaken intentionally, with malice, and/or with reckless indifference to Plaintiff's rights.

256) The numerous misdiagnoses and the continued prescribing of the same inappropriate/inadequate medications to Plaintiff amounted to no care at all and caused him to suffer for an extended period of time from the symptoms of his skin disease, such as rash-like bumps, intense itching, excoriated lesions, painful skin infections, severe scarring of the skin, difficulty sleeping, depression, and humiliation.

257) Plaintiff fully exhausted his administrative remedies in that he submitted two separate Formal Grievances regarding the prescribing of the same medications and/or treatments that continue to fail to resolve or control his skin disease.[43]

258)     **Defendant Centurion was deliberately indifferent to Plaintiff's serious medical needs when it failed to provide him continuing adequate medical care provided by a specialist in violation of the Eighth Amendment of the U.S. Constitution.**

259) On October 14, 2019, Plaintiff was provided access to a specialist after a Consultation Request was approved.

260) On October 14, 2019, the specialist made a diagnosis, recommended medications to be prescribed, and advised Plaintiff that he would see him

---

[43] See Formal Grievance, log # 1809-218-058 Grievance Appeal, log # 18-6-43011; Formal Grievance, log # 1902-402-011, Grievance Appeal, log # 19-6-08989

again for a follow-up in one month's time. *See Statement of Facts, paragraph 51.*

261) On November 4, 2019, Plaintiff had a follow up appointment with the specialist. After seeing no improvements to his condition at that time, the specialist made a recommendation for Plaintiff to continue taking the medications he recommended at a higher dosage level and recommended a follow-up appointment with him in three (3) months time. *See Statement of Facts, paragraph 52.*

262) On or about November 28, 2019, Plaintiff learned that the medication the specialist had recommended he be prescribed (Neurontin) was discontinued.[44]

263) Plaintiff did not have the follow-up appointment as recommended by the specialist until on or about June 15, 2020 (4 months later than when the appointment was recommended to be).

264) Defendant Centurion is responsible for the scheduling of all consultations for specialty care provided by a Comprehensive Health Care Contractor.

265) Sometime after February 10, 2020, Defendant Centurion implemented a policy, due to the Covid-19 Pandemic, that purposely caused delays and/or the rescheduling of all specialty clinic care appointments for all inmates having medical conditions that were non-life threatening.

---

[44] The medical department informed Plaintiff that Neurontin is a class off medication that is not allowed to be prescribed to inmates at Okeechobee Correctional Institution.

266) During the period of time –February 4, 2020 thru on or about June 15, 2020– Plaintiff was repeatedly prescribed inappropriate/inadequate medications that did not provide him relief from the symptoms of his skin disease, e.g., Betamethasone and Triamcinolone.

267) Without adequate medical care, Plaintiff continued to suffer from rash-like bumps, wart-like bumps, intense itching, thinning and easily injured skin as a result zealous use of topical steroids (some potent), excoriated lesions, painful skin infections, atrophy, severe scarring and disfigurement of the skin, loss of hair, difficulty sleeping, physical attacks from other inmates due to his appearance which caused him life threatening injuries, depression, humiliation, and a feeling of hopelessness.

268) As shown by the prolonged delay in providing Plaintiff access to a specialist for a follow-up consultation as recommended by the specialist, Defendant Centurion failed to provide Plaintiff with continuity of adequate medical care for a serious medical condition that was causing him substantial and irreparable bodily harm.

269) At all relevant times, Defendant Centurion knew of the risks and the potential for substantial and irreparable bodily harm that would result if Plaintiff did not receive continuing specialty medical care until his serious chronic skin disease was accurately diagnosed and stabilized with appropriate medications.

270) The failure to provide Plaintiff with continuing adequate medical care from a specialist was deliberate as there is no excuse for failing to provide an inmate access to necessary adequate medical care to prevent substantial and irreparable harm.

271) Plaintiff has exhausted his administrative remedies as he submitted two complaints, one regarding inadequate medical care, and the other regarding the prolonged delay in providing him access to a specialist for necessary medical care.[45]

272)    **Defendant Centurion was deliberately indifferent to Plaintiff's serious medical needs in violation of the Eighth Amendment of the U.S. Constitution and/or committed medical negligence in violation of § 766.102 of the Florida Statutes for having a policy or practice that directed an employee to discontinue Plaintiff's prescribed medication that a specialist had recommended for treatment.**

273) On October 14, 2019, and November 4, 2019, the specialist recommended that Plaintiff be prescribed Neurontin as treatment for his serious skin disease.

274) While housed at the FDC Reception and Medical Center, Plaintiff was prescribed the medication (Neurontin) as recommended and began receiving it within a few days to one week's time of his October 14, 2019, appointment with the specialist.

---

[45] See Formal Grievance, log #2002-209-130; Grievance Appeal, log #20-6-12057; Formal Grievance, log # 2005-216-029, Grievance Appeal, log # 20-6-18999

275) On November 21, 2019, Plaintiff was transferred to Okeechobee Correctional Institution, the institution where he was previously assigned prior to his medical appointments with the specialist (Defendant Solano) at the FDC Reception and Medical Center.

276) On or about November 28, 2019, Plaintiff learned that the medical department discontinued his prescribed medication (Neurontin); citing that that class of medication was not allowed to be prescribed to inmates at Plaintiff's current assigned facility. *See Statement of Facts, paragraph 54*

277) An employee of Defendant Centurion acted on a policy or practice that restricted Plaintiff from using certain medications, specifically, a Schedule 3 –Class C drug (Neurontin), while he was being housed at Okeechobee Correctional Institution.

278) Neurontin medication was recommended by the specialist, prescribed while at FDC Reception and Medical Center, and then discontinued prior to Plaintiff's follow-up appointment with the specialist.

279) Defendant Centurion could have initiated a medical transfer and sent Plaintiff to an institution that allowed inmates to use the class of medication so that he could continue with the treatment regimen recommended by the specialist.

280) During the period of time –November 28, 2019 thru on or about June 15, 2020– Plaintiff was continuously being prescribed ineffective and less

efficacious medications, e.g., Triamcinolone Cream/Ointment, Betamethasone Cream, antibiotics, and Benadryl in place of the medication that was recommended by the specialist.

281) The failure to continue providing the medication (Neurontin) prescribed as recommended by the specialist was the direct cause of Plaintiff's continued suffering from rash-like bumps, wart-like bumps, intense itching, atrophy, severe scarring and disfigurement of the skin, loss of hair, difficulty sleeping, humiliation, depression, and a feeling of hopelessness.

282) Plaintiff formally served his Notice of Intent to Initiate Medical Negligence Litigation on Defendant Centurion on October 19, 2021.

283)    **Defendant Molina was deliberately indifferent to Plaintiff's serious medical needs in violation of the Eighth Amendment of the U.S. Constitution and/or committed medical negligence in violation of § 766.102 of the Florida Statutes when he failed to provide adequate medical care for treatment of a serious medical condition.**

284) On July 31, 2020, Defendant Molina was the medical director and physician at Mayo Correctional Institution and was acting within the scope of his duties as an employee of Centurion of Florida, LLC.

285). On this day, Plaintiff had an appointment with him. During the appointment the following occurred:

a. Defendant  Molina advised that Plaintiff was there to see whether the

medical hold that was placed on him while he was at Madison C.I. was still necessary.

b. Plaintiff brought to Defendant Molina's attention that the current state of his serious skin disease was poor. He informed him of his discomfort, intense itching, rash-like bumps, excoriated lesions, and painful skin infections, and difficulty sleeping.

c. Defendant Molina stated "I don't know about that. You are only here about the medical hold. You will have to sign up for sick call.

d. Defendant Molina refused to examine Plaintiff.

286) Defendant Molina's refusal to examine Plaintiff and provide adequate medical care left him to tend to numerous excoriated lesions and painful skin infections without antibiotic medication(s) and/or soothing ointments and/or bandages.

287) Later that same day (July 31, 2020), Plaintiff submitted a Sick Call Request as instructed by Defendant Molina but because Mayo Correctional Institution was placed under quarantine status on August 6, 2020, Plaintiff was never called for a sick call appointment nor was he seen by any medical personnel for care of his serious skin disease in a timely manner after submitting a Sick Call Request.

288) Defendant Molina's failure to provide Plaintiff adequate medical care at the

70

time he asked for help on July 31, 2020, caused him to continue to suffer from rash-like bumps, wart-like bumps, intense itching, excoriated lesions, painful skin infections, and severe scarring.

289) Plaintiff's medical needs required adequate medical care for a serious chronic skin disease to prevent further substantial and irreparable bodily harm.

290) Plaintiff has exhausted his administrative remedies as he submitted a Formal Grievance regarding inadequate medical care.[46]

291) Plaintiff formally served his Notice of Intent to Initiate Medical Negligence Litigation on Defendant Molina on October 19, 2021.

292)     **Defendant Perry committed medical malpractice and medical fraud when she falsified medical records in violation of § 456.0635 and § 766.102 of the Florida Statutes.**

293) On August 6, 2020, Mayo Correctional Institution was officially placed on quarantine status. There was no inmate movement due to the institutional lock down for quarantine. All upcoming medical appointments that were scheduled had to be cancelled and/or rescheduled.

294) On August 12, 2020, Defendant Perry documented that Plaintiff was seen by her on this date, documented that she diagnosed Plaintiff with scabies, and

---

[46] See Formal Grievance, log # 2002-209-130; Grievance Appeal, log #20-6-12057

documented that she prescribed Plaintiff medication(s) for treatment.[47]    *See Statement of Facts, paragraph 79.*

295) Plaintiff was not seen by Defendant Perry on August 12, 2020, nor did he receive any of the medication(s) that Defendant Perry ordered/prescribed as documented on the clinical report.

296) It was not until after Mayo Correctional Institution's quarantine status was lifted on or about September 9, 2020, when the medical department resumed normal routine clinic appointments for inmates.

297) September 15, 2021, was the day, the only day that Plaintiff was seen by Defendant Perry.[48]

298) Defendant Perry committed medical malpractice/medical fraud by knowingly falsifying an official record relating to an individual in the care and custody of a state agency, and which act has the potential to detrimentally affect the health, safety, or welfare of that individual in violation of § 456.0635 of the Florida Statutes.

299) The clinical report fraudulently made by Defendant Perry on August 12, 2020, is now located in Plaintiff's medical file.

300) The fraudulent falsification of an official recording stating that medical

---

[47] See Plaintiff's clinical file on this date and compare to dates Mayo Correctional Institution was on quarantine status.

[48] Sometime shortly after Plaintiff's appointment with Defendant Perry she was relieved of her duties at Mayo Correctional Institution.

services were provided to Plaintiff for treatment of his serious chronic medical condition was detrimental and has affected the health, safety, or welfare of Plaintiff.

301) The fraudulent documentation of medical services rendered to Plaintiff caused Plaintiff continued suffering in that he did not receive medical assistance for his serious medical condition until September 15, 2020.

302) At the relevant times, Defendant Perry was acting within the scope of her duties as employee of Centurion of Florida, LLC.

303) Defendant Perry's actions were undertaken intentionally, with malice, and/or with reckless indifference to Plaintiff's rights.

304) Plaintiff formally served his Notice of Intent to Initiate Medical Negligence Litigation on Defendant Perry on October 19, 2021.

305) **Defendant's Perry, Laubaugh, and Westfall were deliberately indifferent to Plaintiff's medical needs in violation of the Eighth Amendment of the U.S. Constitution and/or committed medical negligence in violation of § 766.106 of the Florida Statutes for knowingly making inaccurate diagnoses and for routinely prescribing inappropriate/inadequate, easier, and less efficacious courses of treatments as treatment for a serious medical condition.**

306) During the period of time –September 15, 2020 thru March 30, 2021– Plaintiff continued to seek adequate medical care for relief from the symptoms of his skin disease; a serious medical condition.

307) During that same period of time, Plaintiff was provided inappropriate/inadequate medical care, was repeatedly misdiagnosed, and repeatedly prescribed easier and less efficacious courses of treatment which subjected Plaintiff to continuing substantial and irreparable bodily harm. *See Statement of facts, paragraphs 83(a); 86(b); 89(b); 96; 97; 98; 100; 101(i-ix); 103(b); 105; 111; 112(d).*

308) On September 15, 2020, Plaintiff was seen by Defendant Perry. Defendant Perry diagnosed Plaintiff with scabies infestation and prescribed Permetherin Lotion, Ivermectin, Prednisone, and possibly antibiotics for treatment without conducting an examination and without reviewing Plaintiff's medical history.

309) Prior to leaving Defendant Perry's office that day, Plaintiff informed her that the types of medications she was prescribing to him had repeatedly failed to resolve his skin disease in the past.

310) On or about November 9-11, 2020, Plaintiff was seen by Defendant Laubaugh. On this day, Plaintiff was informed of the biopsy results from the skin sample he provided on October 16, 2020; which informed that no organic matter was discovered.

311) On the same day, Defendant Laubaugh diagnosed Plaintiff with scabies infestation and prescribed him Ivermectin for treatment.

312) Plaintiff discussed with Defendant Laubaugh the history of the medication

that was being prescribed to him; specifically the fact that Ivermectin medication had repeatedly been prescribed to him in the past and failed to resolve his skin disease.

313) After transferring to Putnam Correctional Institution, Plaintiff had several appointments with Defendant Westfall beginning on December 4, 2021.

314) During that first appointment with Defendant Westfall, Plaintiff discussed the history of his medical condition, whereby advising Defendant Westfall of the medications and/or treatments previously tried and failed.

315) Defendant Westfall insisted on retrying all previously prescribed medications, stating "[y]ou are at Putnam now and we have to do everything over because we haven't done them here."

316) Plaintiff had several appointments with Defendant Westfall over the next 3 months and Plaintiff was indeed prescribed all of the previously–tried and failed– medications such as Triamcinolone Acetonide Cream USP, 0.01%, Clobetasol Propionate Ointment USP 0.05%, Prednisone, antibiotics, Ketoconazole Cream, Fluconazole, Permetherin Lotion, and Ivermectin. *See Statement of Facts, paragraphs 89(b); 96; 97(a); 98; 100; 101(i–ix); 103(b); 105.*

317) During each appointment, Plaintiff advised Defendant Westfall that the medications and treatments he insisted on prescribing to him were already

prescribed numerous times in the past."

318) The medications did not help or provide Plaintiff any relief from intense itching, prickly or biting sensations, rash-like bumps, wart-like thickened patches and bumps, puss-filled blisters, skin atrophy, excoriated lesions, painful skin infections, severe scarring, and disfigurement of the skin.

319) On March 30, 2021, Plaintiff was seen by Defendant Westfall. Plaintiff advised him that his skin disease still persisted after finishing all of the medication and treatments prescribed.

320) Defendant Westfall responded by stating, "I am not a dermatologist. There is nothing more that I can do to treat your skin disease. I am going to refer you to a dermatologist."

321) The symptoms of Plaintiff's skin disease were affecting the entirety of his body, including his face; causing substantial damage to his skin and negatively altering his physical appearance.

322) At all relevant times, the visible symptoms of Plaintiff's skin disease did not resemble characteristics of scabies infestation, in that the visible symptoms did not show any raised red skin in a line (representing burrows) and possibly blisters or pustules, he did not have bumps or burrows between the fingers, on the elbow crease, armpit, groin crease, or behind the knees.

323) At all relevant times, Defendant's Perry, Laubaugh, and Westfall knew or

should have known that Plaintiff did not have scabies infestation and that the medications and treatments they insisted on prescribing to Plaintiff for treatment of his skin disease were inappropriate/inadequate based on the extensive medical history of his skin disease that is well documented in Plaintiff's medical records.

324) When Defendant's Perry, Laubaugh, and Westfall diagnosed Plaintiff with scabies and prescribed him the same medications (Ivermectin, Permetherin, Prednisone, or Triamcinolone, etc.), while having knowledge that they had already proven to be inappropriate/inadequate to treat Plaintiff's skin disease in the past, Defendant's Perry, Laubaugh, and Westfall failed to utilize ordinary knowledge, skill, and care both in diagnosis and in treatment of his skin disease.

325) Defendant's Perry, Laubaugh, and Westfall should have used the knowledge, skill, and care that is ordinarily possessed and employed by members of the profession in good standing and acknowledged that Plaintiff required a level of care beyond their level of expertise and subsequently taken the necessary steps to provide Plaintiff that level of care by making a referral for specialist at their earliest contact with Plaintiff and his medical records.

326) Instead, Defendant's Perry, Laubaugh, and Westfall were deliberately indifferent to Plaintiff's serious medical needs when they insisted on making

inaccurate diagnoses and only providing medical care to Plaintiff that was so grossly incompetent, cursory, and inadequate which amounted to no care at all.

327) Plaintiff's need for adequate medical care and appropriate/adequate medications for treatment of his serious skin disease was so obvious.

328) The symptoms of Plaintiff's skin disease continued on in their progression during the period of time –September 15, 2020, thru March 30, 2021– due to Defendant's Perry, Laubaugh, and Westfall's misdiagnoses of scabies and the subsequent prescribing of inappropriate/inadequate medications to treat his skin disease (Ivermectin, Permetherin Lotion, Prednisone, Triamcinolone, Clobetasol, etc.).

329) Plaintiff abided by the inappropriate/inadequate medications and treatment regimens prescribed by Defendant's Perry, Laubaugh, and Defendant Westfall even though he knew that they would be of no help in bringing him any relief just so that it would not be determined that he refused medical care.

330) The misdiagnoses and the inappropriate/inadequate prescribing of medications and treatments caused Plaintiff to suffer every day from intense itching, prickly or biting sensations, rash-like bumps, wart-like thickened patches and bumps, puss-filled blisters, atrophy, excoriated lesions, painful skin infections, severe scarring and disfigurement of the skin, difficulty sleeping, humiliation,

severe depression, stress, and the feeling of hopelessness.

331) At the relevant times, Defendant's Perry, Laubaugh, and Westfall were acting within the scope of their duties as employees of Centurion of Florida, LLC.

332) Defendant's Defendant's Perry, Laubaugh, and Westfall's actions were undertaken intentionally, with malice, and/or with reckless indifference to Plaintiff's rights.

333) Plaintiff fully exhausted his administrative remedies in that he submitted two separate Formal Grievances regarding the prescribing of the same medications and/or treatments that continue to fail to resolve or control his skin disease.[49]

334) Plaintiff formally served his Notice of Intent to Initiate Medical Negligence Litigation on Defendant's Perry, Laubaugh, and Westfall on October 19, 2021.

335)      **Defendant Westfall was deliberately indifferent to Plaintiff's serious medical needs in violation of the Eighth Amendment of the U.S. Constitution and/or committed medical negligence in violation of § 766.106 of the Florida Statutes for prescribing medication known to be harmful.**

336) During the period of time –December 4, 2021 thru March 16, 2021– Defendant Westfall insisted on prescribing topical steroid medications to Plaintiff, such as Triamcinolone Acetonide Cream USP, 0.01% and Clobetasol

---

[49] See Formal Grievance, log # 1809-218-058; Grievance Appeal, log # 18-6-43011; Formal Grievance, log # 1902-402-011; Grievance Appeal, log # 19-6-08989.

Propionate Ointment USP 0.05%, even though the specialist recommended on or about June 15, 2020, not to prescribe Plaintiff this type of medication because it was thinning his skin, leaving it prone to easy injury and painful skin infections.

337) In addition to what the specialist discovered during that appointment on or about June 15, 2020, Plaintiff also began noticing a diminishment of his eyesight as it was becoming more and more difficult to see objects from a distance.

338) Topical steroid creams and ointments were continuously and zealously prescribed to Plaintiff as treatment for his skin disease dating back to 2017.

339) Plaintiff was always directed by prescribing care providers to apply the topical steroids to all affected areas twice daily (affected areas included his face).

340) The prolonged overzealous use of topical steroids (some potent) were harmful to Plaintiff's overall health as they caused his skin to become very thin, easily injured, and prone to sores and painful skin infections.

341) The prolonged overzealous use of topical steroids was also the cause of Plaintiff's diminishing eyesight.

342) It was determined by an optometrist on March 8, 2021, that Plaintiff is now nearsighted and is required to where eye glasses.

343) Defendant Westfall chose to ignore documented evidence of the harmful

effects being caused to Plaintiff from the prolonged overzealous use of topical steroids; he disregarded the recommendation of the specialist, and insisted on continuing to prescribe a medication that was not beneficial in treatment of Plaintiff's skin disease.

344) Defendant Westfall was negligent in his duties as a licensed physician when he failed to use the knowledge, skill, and care ordinarily possessed and employed by members of the profession in good standing when he chose to ignore documented evidence of what the harmful effects from overuse of topical medications were, for disregarding the recommendation of the specialist, and for insisting to just continue using a medication that had no beneficial properties for treatment of Plaintiff's skin disease.

345) Defendant Westfall's choice to ignore medical evidence and his insistence to prescribe Plaintiff topical steroid medications caused the continued thinning of his skin; leaving it prone to easy injury and led to the development of endless painful skin infections and the furtherance of his diminishing eyesight.

346) At the relevant times, Defendant Westfall was acting within the scope of his duties as employees of Centurion of Florida, LLC.

347) Defendant's Westfall's actions were undertaken intentionally, with malice, and/or with reckless indifference to Plaintiff's rights.

348) Plaintiff fully exhausted his administrative remedies in that he submitted two

separate Formal Grievances regarding the prescribing of the same medications and/or treatments that continue to fail to resolve or control his skin disease.[50]

349) Plaintiff formally served his Notice of Intent to Initiate Medical Negligence Litigation on Defendant Westfall on October 19, 2021.

350)    **Jane Doe #1 and Jane Doe #2 were deliberately indifferent to Plaintiff's medical needs in violation of the Eighth Amendment of the U.S. Constitution and/or committed medical negligence in violation of § 766.106 of the Florida Statutes for refusing to provide Plaintiff access to medical care, via the Sick Call Requests he submitted.**

351) On July 16, 2021, Plaintiff submitted a Sick Call Request to seek medical care for the treatment of intense itching, excoriated lesions, skin infections, burning sensations, and pain.

352) The Sick Call Request submitted on July 16, 2021, was not met with a response.

353) The Sick Call Request that Plaintiff submitted on Friday July 16, 2021, due to the weekend, would have or should have been retrieved from the designated Sick Call Box on or no later than Monday July 19, 2021, by medical staff.

354) Defendant Jane Doe #1, the RN assigned to reviewing and triaging Sick Call Requests on July 19, 2021, deprived Plaintiff of needed medical care he

---

[50] See Formal Grievance, log # 1809-218-058; Grievance Appeal, log # 18-6-43011; Formal Grievance, log # 1902-402-011; Grievance Appeal, log # 19-6-08989

requested for care of a serious medical condition.

355) On July 29, 2021, Plaintiff submitted a Sick Call Request to seek medical care for the treatment of itching, excoriated lesions, painful skin infections, and burning sensations.

356) The Sick Call Request submitted on July 29, 2021, was not met with a response.

357) The Sick Call Request Plaintiff submitted on July 29, 2021, would have or should have been retrieved from the designated Sick Call Box on or no later than July 30, 2021, by medical staff.

358) Defendant Jane Doe #2, the RN assigned to reviewing and triaging Sick Call Requests on July 30, 2021, deprived Plaintiff of needed medical care he requested for care of a serious medical condition.

359) By FDC policy, the process to initiate requests for Sick Call Services will be available to inmates on a daily basis and Nursing Staff will review each Sick Call Request submitted to determine the urgency/seriousness of the inmates complaint and then assign a triage level.

360) According to policy, a triage level "2" was warranted for the medical complaints Plaintiff made on his Sick Call Request where he complained of itching, excoriated lesions, painful skin infections, and burning sensations.

361) He made similar complaints in both Sick Call Requests submitted on July 16,

2021, and July 29, 2021.

362) All medical staff at Putnam Correctional Institution were well aware of Plaintiff's serious medical condition at the time he submitted his Sick Call Requests.

363) Jane Doe #1 and Jane Doe #2 were deliberately indifferent to Plaintiff's medical needs when they failed to schedule him an appointment with the Sick Call nurse-on-duty to provide him the medical care that he requested.

364) As a result of not being provided access to medical staff via his Sick Call Requests, Plaintiff continued to suffering from intense itching, excoriated lesions, painful skin infections, and burning sensations, depression, stress, and difficulty sleeping.[51]

365) Plaintiff was deprived of anitibiotic ointments, soothing creams, bandages, etc.

366) Plaintiff also submitted an institutional level Formal Grievance about not being provided access to Sick Call via the Sick Call Request he submitted on July 29 2021, and after the medical department reviewed his complaint, he still was not provided access to medical care through the Sick-Call process.

367) The institutional level Formal Grievance in regards to Plaintiff's denial access to medical care through the Sick-Call process, in itself, should have initiated a

---

[51] Note that Plaintiff was not receiving any medications for care of his skin disease after June 5, 2021, nor was he receiving medication at the time he submitted the Sick Call Requests.

Sick Call appointment and/or should have been considered as a Sick Call Request.

368) Plaintiff was denied access to the medical care he requested for in compliance with FDC Procedure 403.006; depriving him of adequate medical care in a violation of the Eighth Amendment of the United States Constitution.

369) At the relevant times, Jane Doe #1 and Jane Doe #2 were acting within the scope of their duties as employees of Centurion of Florida, LLC.

370) Defendant's Jane Doe #1 and Jane Doe #2's actions were undertaken intentionally, with malice, and/or with reckless indifference to Plaintiff's rights.

371) Plaintiff has an affidavit sworn to and signed by Shawn Ashe who attested that he witnessed Plaintiff place the Sick Call Request into the Sick Call Box on July 29, 2021.

372) Plaintiff fully exhausted his administrative remedies regarding not being provided access to medical care via Sick Call Requests.[52]

373) **Defendant Centurion and Defendant Solano's use of telehealth services to provide Plaintiff necessary care from a specialist amounted to inadequate medical care and medical negligence in violation of the Eighth Amendment of the U.S. Constitution, § 766.106 and § 456.47 of the Florida Statutes.**

374) On August 9, 2021, Plaintiff had a consultation with a specialist. The

---

[52] See Formal Grievance log # 2108-214-003; Grievance Appeal log # 21-6-25502

consultation was conducted via telehealth services. *See Statement of Facts, paragraph 123-126.*

375) As a costs saving measure, Defendant Centurion implemented and acted on a policy that permitted the use telehealth services to provide specialty medical care to inmates.

376) The specialist, Defendant Solano, failed to practice in a manner consistent with his scope of practice and the prevailing professional standard of practice for a health care professional who provides in-person health care services to patients in the State of Florida while using telehealth services.

377) The use of telehealth services deprived Plaintiff of a necessary and thorough –in-person– physical examination of all symptoms of his skin disease, it prevented the specialist from reviewing the extensive medical history of the disease, and it prevented any diagnostic testing.[53]

378) Defendant Solano made his diagnosis and recommendation for treatment after an insufficient patient evaluation and a cursory examination; viewing only two very large excoriated lesions through a webcam.

379) The patient evaluation was very brief and was limited to only what Plaintiff could remember to tell him in just a very short period of time. Plaintiff was not able to inform him of all the different symptoms, including the extensive

---

[53] Note that Plaintiff's medical files were with him at his location at FDC Reception and Medical Center while Defendant Solano's location was somewhere in Jacksonville.

history of his skin disease.

380) The patient evaluation and cursory examination were insufficient to diagnose Plaintiff's skin disease or to make any recommendations for treatment.

381) Plaintiff's skin disease is multifaceted, having many different types of easily visible skin bumps, lesions, papules, blebs, and vesicles.

382) Plaintiff's skin disease also has many not so easily seen symptoms (but could be seen upon closer examination) such as soft wart-like lines and patches of skin, red thread-like linear lines, wheals, and bumps just under the skin that stay the normal skin tone and would not be visible through a webcam examination.

383) Defendant Centurion and Defendant Solano's reliance on and use of telehealth services through a webcam did not allow for all of the symptoms of Plaintiff's skin disease to be documented prior to a diagnosis and recommendation for treatment being made.

384) Plaintiff attests that Defendant Solano had insufficient information after an evaluation of Plaintiff during the telehealth services consultation and he should not have made a diagnosis and recommendation for treatment without an –in-person– physical examination.

385) Defendant Centurion and Defendant Solano's use of telehealth services to provide necessary specialty medical care for Plaintiff's serious medical

condition that limited care to only a patient evaluation that was insufficient and a cursory examination through a webcam has led to another misdiagnosis of Plaintiff's skin disease and the prescribing of inappropriate medications for treatment.

386) Defendant Centurion and Defendant Solano's use of telehealth services to provide medical care to treat Plaintiff's serious medical condition amounted to no care at all and has caused Plaintiff continued suffering and substantial and irreparable bodily harm, in violation of the Eighth Amendment of the U.S. Constitution and  § 766.102 and § 456.47 of the Florida Statutes.

387) Months after the telehealth services consultation with the specialist and as of the date of the filing of this complaint, Plaintiff still suffers from itching, rash-like bumps, wart-like thickened patches and bumps, puss-filled blisters, atrophy, excoriated lesions, painful skin infections, severe scarring and disfigurement of the skin, difficulty sleeping, humiliation, severe depression, stress, and the feeling of hopelessness.

388) Defendant Centurion's policy that permitted the use telehealth services to provide specialty medical care to Plaintiff and Defendant Solano's failure to practice in a manner consistent with his scope of practice and the prevailing professional standard of practice for a health care professional who provides in-person health care services to patients in the State of Florida while using

telehealth services is the direct cause of another misdiagnosis and inappropriate medications being prescribed.

389) At the relevant times, Defendant Solano was acting within the scope of his duties as a subcontractor working under Centurion of Florida, LLC.

390) Defendant Solano's actions were undertaken intentionally, with malice, and/or with reckless indifference to Plaintiff's rights.

391) Defendant Centurion and Defendant Solano's failure to provide adequate medical care to Plaintiff caused him to continue suffering and subjected him to substantial and irreparable bodily harm.

392) Plaintiff fully exhausted his administrative remedies regarding not being provided adequate medical care during the consultation with the specialist.[54]

393) Plaintiff formally served his Notice of Intent to Initiate Medical Negligence Litigation on Defendant Centurion and Defendant Solano on October 19, 2021.

394)     **Defendant Centurion was deliberately indifferent to Plaintiff's serious medical needs in violation of the Eighth Amendment of the U.S. Constitution when it disapproved the prescribing of a medication that was recommended for treatment by a specialist.**

395) On August 17, 2021, after being informed of what the specialist had diagnosed Plaintiff's skin disease as, Defendant Westfall informed Plaintiff that a certain

---

[54] See Formal Grievance, log # 2108-214-109; Grievance Appeal, log # 21-27305

medication was disapproved for prescribing to him.

396) The specialist diagnosed Plaintiff's skin disease as 'Neurodermatitis.'

397) Two (2) medications, Neurontin and Doxepin, were recommended by the specialist for treatment of Plaintiff's 'Neurodermatitis.'

398) Defendant Westfall informed Plaintiff that the Neurontin medication was not approved for prescribing to him.

399) The explanation provided to Plaintiff, at that time, was that [Defendant Centurion does not allow] "certain medications such as Neurontin are not allowed to be prescribed to inmates because of the type/class of medication and because of costs.

400) Defendant Centurion's policies, directives, and procedures are being used to disapprove a medication that may be the appropriate treatment for Plaintiff's skin disease.

401) No alternative means of satisfying Plaintiff's medical needs was provided other than permitting Plaintiff to follow one (1) part of the two (2) part treatment regimen that was recommended by the specialist.

402) Defendant Centurion only allowed Plaintiff be prescribed the Doxepin medication as recommended by the specialist.

403) Doxepin medication is classified as an antidepressant but in low dosage usage it used as an antihistamine, which is how this medication was recommended

to be prescribed to Plaintiff.

404) Defendant Westfall already decided that there was nothing more that he could do to treat Plaintiff's skin disease on March 30, 2021.

405) Plaintiff requires specialized medical care for a serious unstable chronic skin disease.

406) Specialized medical care is not available at Putnam Correctional Institution, the institution where Plaintiff is assigned.

407) Defendant Centurion and Defendant Westfall were well aware of the seriousness of Plaintiff's skin disease and the risk of further substantial irreparable bodily harm that would result if the treatment regimen recommended by the specialist was not followed.

408) While using only the Dexepin medication, following only a partial treatment recommendation of the specialist after it was determined that Plaintiff required specialized medical care, Plaintiff still continues to be suffer itchiness and still develops rash-like bumps, excoriated lesions, and painful skin infections that cause deep skin scarring and disfigurement of the skin.

409) Defendant Centurion refusal to provide adequate medical care to Plaintiff caused him to continue suffering and subjected him to substantial and irreparable bodily harm.

410) Plaintiff has exhausted his administrative remedies as he submitted a Formal

Grievance regarding inadequate medical care.[55]

411) Plaintiff formally served his Notice of Intent to Initiate Medical Negligence Litigation on Defendant Centurion on October 19, 2021.

412) **Defendant Dawson was deliberately indifferent to Plaintiff's serious medical needs in violation of the Eighth Amendment of the U.S. Constitution and/or committed medical negligence in violation of § 766.106 and § 464.012 of the Florida Statutes when she ignored complaints and obvious signs of the ineffectiveness of prescribed medication and when she refused to make necessary referrals to obtain the level of medical care Plaintiff required for a serious medical condition.**

413) On September 17, 2021, Defendant Dawson, was the highest rated level of licensed employee of Defendant Centurion working in Putnam Correctional Institution's medical department, as Defendant Westfall, Medical Director, was out on a leave of absence with an undisclosed medical condition.

414) Defendant Dawson is an employee of Defendant Centurion and licensed as an advanced registered nurse practitioner pursuant to § 464.012 of the Florida Statutes.

415) As an advanced registered nurse practitioner, Defendant Dawson may manage patients with stable chronic diseases within the framework of established protocol.

416) On September 17, 2021, Plaintiff had a follow-up appointment with

---

[55] See Formal Grievance, log # 2002-209-130; Grievance Appeal, log #20-6-12057

Defendant Dawson. At the time of this appointment Plaintiff's skin disease remained unstable. It had not improved since his consultation with the specialist on August 9, 2021, his last appointment with Dr. Westfall on August 17, 2021, or since taking medication, Doxepin, as recommended by the specialist, which began on August 19, 2021. Plaintiff's skin was still very irritated, itchy, had several excoriated lesions, and painful skin infections. The following occurred during the appointment on September 17, 2021:

a. Plaintiff showed her several irritated areas of his skin which had numerous bumps, inflammation, several excoriated lesions, and painful infections. Defendant Dawson advised that she was going to prescribe antibiotics, (Doxycycline).

b. Plaintiff then informed her that Doxycycline does not help improve his condition at all.

c. Plaintiff's medical records will show that this medication (Doxycycline) has been prescribed to him numerous times in the past and had no positive effect to Plaintiff's many skin infections or to any of the other symptoms of his skin disease.

d. Plaintiff also advised Defendant Dawson that he was using the medication Doxepin as recommended by the specialist for 4 weeks and that it was not helping to improve his skin disease and that it was only causing him to

93

have blurred vision and behavioral issues, e.g., confusion, irritability, and agitatation.

e.  Plaintiff also advised Defendant Dawson that he has had the skin disease for about 4½ years. Defendant Dawson responded by stating, "[y]eah, and you will likely have it until you leave here [meaning prison]."

f.  Defendant Dawson concluded the appointment by stating that "Dr. Westfall has submitted a specialist consult request already." I then informed her that it was for a follow-up with the specialist in February as the specialist had recommended but that I needed help now. Defendant Dawson responded by stating, "we are done here."

417) On October 14, 2021, Plaintiff was seen by Defendant Dawson and again he showed her several irritated areas of his skin which had numerous bumps, inflammation, several excoriated lesions, and painful infections.

418) Defendant Dawson prescribed Bacitracin Ointment for care of his skin excoriations and infections.

419) Plaintiff also advised Defendant Dawson again on October 14, 2021, that the medication (Doxepin), which the specialist recommended, was not helping to make improvements to his skin disease and that it was only causing him to have blurred vision and behavioral issues, e.g., confusion, irritability, and agitation.

420) As evidenced by her failure to make necessary referrals for Plaintiff to see a licensed physician and her failure to make a referral to obtain an earlier follow-up consultation with the specialist, it is evident that Defendant Dawson ignored his complaints about the ineffectiveness of the medication he was taking (Doxepin) as treatment for his skin disease.

421) The medication was not providing him any relief from his suffering from bumps, inflammation, numerous excoriated lesions, painful skin infections, amongst many other symptoms of his skin disease.

422) At the relevant times, Defendant Dawson knew the she was not qualified or licensed to provide the level of medical care Plaintiff required.

423) At the relevant times, Defendant Dawson was fully aware that Plaintiff required a level of care provided by a licensed physician and/or a specialist for treatment of a serious medical condition as he was already under a specialist's care for a serious and unstable chronic medical condition.

424) Defendant Dawson knew that the medication Plaintiff was currently taking as recommended by the specialist, and the medications she prescribed to him (Doxycycline and Bacitacrin), were inadequate to provide him relief from the symptoms of his skin disease.

425) Defendant Dawson also did not request for any follow-up medical appointments with a care provider to take place after October 14, 2021. This

failure left his medical condition unmonitored and caused further delay in medical care.

426) Plaintiff had assumed that a follow-up appointment was forthcoming when he left Defendant Dawson's office that day.

427) In fact, Plaintiff waited two (2) months for a follow-up appointment before he concluded that Defendant Dawson had not requested or scheduled Plaintiff for any follow-up appointment with a care provider.

428) On December 12, 2021, because Plaintiff had not had any follow-up medical care since his appointment on October 14, 2021, he submitted a Sick Call Request to seek medical care for his continuing unresolved serious medical condition that was causing him to suffer from itching, rash-like bumps, itching, excoriated lesions, and painful skin infections.

429) Defendant Dawson acted with deliberate indifference to Plaintiff's serious medical needs and did not use the knowledge, skill, and care ordinarily possessed and employed by members of the profession in good standing when she did not make the necessary referrals to advance Plaintiff's care to a licensed physician or submit a Consultation Request to obtain an earlier follow-up consultation with the specialist.

430) Defendant Dawson did not make the necessary referrals to advance Plaintiff's care to a licensed physician because there was not a licensed physician

available.

431) Defendant Dawson was acting to camouflage Defendant Centurion's failure to sufficiently staff the medical department at Putnam Correctional Institution.

432) Defendant Dawson's actions were undertaken intentionally, with malice, and/or with reckless indifference to Plaintiff's rights.

433) Defendant Centurion's failure to sufficiently staff the medical department in conjunction with Defendant Dawson failing to make necessary referrals to a licensed physician is evidence of the administering of medical care outside the framework of an established protocol in violation of § 458.348 of the Florida Statutes which deprived Plaintiff of adequate medical care.

434) Defendant Dawson was negligent in her duties as an advanced registered nurse practitioner when she failed to use the knowledge, skill, and care ordinarily possessed and employed by members of the profession in good standing when she decided that Plaintiff did not require medical care beyond her level of expertise and for prescribing medications that were well known and thoroughly documented to be ineffective.

435) Defendant Dawson's refusal to provide or advance Plaintiff's care to the level of care he required caused him to continue suffering and subjected him to substantial and irreparable bodily harm in violation of § 766.102 of the Florida Statutes.

436) Plaintiff still suffers from itching, rash-like bumps, wart-like thickened patches and bumps, puss-filled blisters, atrophy, excoriated lesions, painful skin infections, severe scarring and disfigurement of the skin, difficulty sleeping, humiliation, severe depression, stress, and the feeling of hopelessness.

437) Plaintiff fully exhausted his administrative remedies regarding not being provided adequate medical care during the medical appointments with Defendant Dawson.[56]

438) Plaintiff formally served his Notice of Intent to Initiate Medical Negligence Litigation on Defendant Dawson on October 19, 2021.

439) **Defendant Dawson committed medical malpractice when she performed acts that only a Chief Health Officer or a clinical designee may perform; in violation of Chapter 33-103.008 of the Florida Administrative Code and § 766.102 and § 464.012 of the Florida Statutes.**

440) On September 21, 2021, Plaintiff submitted an institutional level Formal Grievance in regards to not being provided adequate medical care during an appointment with Defendant Dawson on September 17, 2021.[57]

441) On October 1, 2021, Plaintiff's institutional level Formal Grievance was returned denied. Defendant Dawson was the responding employee and stated

---

[56] See Formal Grievance, log # 2109-214-018; Grievance Appeal, log # 21-6-30978

[57] See Formal Grievance, log # 2109-214-018

the following in response:

> "Management of your chronic dermatitis is appropriate. The medical team ongoing care handles you with great concern and care."[58]

442) Defendant Dawson knowingly responded to an FDC institutional level Formal Grievance submitted by Plaintiff in violation of Ch. 33-103.008(1) F.A.C. wherein it specifically states that "if a formal grievance of a medical nature is filed at the institutional level it shall be forwarded to the institution's Chief Health Officer or clinical designee for investigation and response."

443) It further states that "[t]he review and initialing of the grievance response shall be made by the Chief Health Officer or clinical designee. A clinical designee is a physician with an active Florida license and who is credentialed by the Department of Corrections, or, if the physician is a Department of Corrections contractor's employee, is credentialed by the contractor."

444) Defendant Dawson is an advanced registered nurse practitioner and acted as a licensed physician when she responded to an institutional level Formal Grievance submitted by Plaintiff in regards to his medical care.

445) The complaints Plaintiff made in his Formal Grievance regarding not receiving adequate medical care during his appointment with Defendant Dawson on September 17, 2021, were never reviewed by a licensed physician

---

[58] See Part B – Response, Formal Grievance, log #2109-214-018

and has resulted in an insufficient response to his medical related complaints being provided to him by unauthorized medical personnel.

446) In the Formal Grievance regarding not being provided adequate medical care on September 17, 2021, Plaintiff specifically complained that the medication he was taking (Doxepin) was not helping to provide him relief from the symptoms of his skin disease.

447) The complaint made about how the medication he was taking (Doxepin) was not helping to provide him relief from the symptoms of his skin disease required an appointment with a licensed physician or a specialist to be scheduled for further review or evaluation or for a sufficient response to be provided from a licensed physician explaining the medical reasoning not to make any changes to the prescribed medication.

448) Defendant Dawson's response and signature on the Part B Response of an institutional level Formal Grievance of a medical nature was unauthorized and has deprived Plaintiff of a fair review of the medical related complaints made in the Formal Grievance he submitted on September 17, 2021, which required, at a minimum, a response from a licensed physician; in violation of Chapter 33-103.008(1) of the Florida Administrative Code.

449) At the time, Plaintiff submitted his institutional level Formal Grievance Putnam Correctional Institution's medical department was not operating in compliance with Florida Law and the negotiated contract with FDC.

450) As early as September 17, 2021, thereafter, and at the time Plaintiff's institutional level Formal Grievance was submitted for review, the medical services were being administered to inmates by an advanced registered nurse practitioner outside the framework of an established protocol maintained on-site; in violation of Florida Law.

451) Between September 17, 2021 and November 5, 2021, Defendant Dawson was the highest rated level of licensed employee of Defendant Centurion that was providing medical care to patients at Putnam Correctional Institution.

452) Defendant Centurion's failure to ensure adequate staffing at Putnam Correctional Institution led to the violation of Florida Law and deprived Plaintiff of a fair review of the medical related complaints made in the Formal Grievance he submitted on September 20, 2021.

453) Defendant Dawson's illegal act of responding to Plaintiff's Formal Grievance resulted in an insufficient response being provided by unauthorized medical personnel in response to his medical related complaints; further depriving him of adequate medical care in violation of the Eighth Amendment of the U.S. Constitution.

454) At the relevant times, Defendant Dawson was acting within the scope of her duties as an employee of Centurion of Florida, LLC.

455) Defendant Dawson's actions were undertaken intentionally, with malice, and/or with reckless indifference to Plaintiff's rights.

456) Defendant Dawson committed medical malpractice in violation of § 766.102; § 464.012 of the Florida Statutes and Ch. 33-103.008(1) F.A.C. when she knowingly acted as a licensed physician by responding to Plaintiff's medical related complaints made in the Formal Grievance he submitted on September 20, 2021, which required, at a minimum, a response provided by a licensed physician.

457) Plaintiff still suffers from itching, rash-like bumps, wart-like thickened patches and bumps, puss-filled blisters, atrophy, excoriated lesions, painful skin infections, severe scarring and disfigurement of the skin, difficulty sleeping, humiliation, depression, stress, and the feeling of hopelessness.

458) Plaintiff formally served his Notice of Intent to Initiate Medical Negligence Litigation on Defendant Dawson on October 19, 2021.

459) **Defendant Centurion failed to provide Plaintiff adequate medical care and/or committed medical malpractice for providing medical services outside the framework of an established protocol as the medical services were being administered to inmates by an Advanced Registered Nurse Practitioner outside the framework of an established protocol in violation of § 458.348(1)(a); § 464.012(3) of the Florida Statutes.**

460) Beginning as early as September 17, 2021, or a specific day earlier, the medical services provided to inmates within Putnam Correctional Institution's medical department operated outside the framework of an established protocol maintained on-site.

461) The medical services were being administered to inmates by an advanced registered nurse practitioner.

462) There was no oversight being provided by a licensed physician and the medical services provided remained unsupervised in violation of Florida Law and in violation of Defendant Centurion's contract with FDC.

463) The medical department's Chief Health Officer/Medical Director and licensed physician was on a leave of absence due to a personal undisclosed medical issue; he was no longer available to provide oversight of the medical services being provided to inmates.

464) Defendant Westfall had been the only employed licensed physician working in Putnam Correctional Institution's Medical Department to provide the oversight and supervision of medical services being provided to patients.

465) After Defendant Westfall took his leave of absence, Defendant Dawson, ARNP, was the highest rated level of licensed employee of Defendant Centurion that provided medical care to patients at Putnam Correctional Institution.

466) It wasn't until November 5, 2021, when Plaintiff learned that the medical department at Putnam Correctional Institution began having a licensed physician physically present or in a supervisory role over the medical department to provide oversight of the administering of medical services to patients within the framework of an established protocol.

467) On November 5, 2021, the medical department was brought back into compliance with § 458.348 (1)(a) and § 464.012(3) of the Florida Statutes, and the staffing requirements of the negotiated contract between Centurion of Florida, L.L.C. and the Florida Department of Corrections.

468) Plaintiff attests that there was no on-site supervision or oversight by a licensed physician at Putnam Correctional Institution for the medical services provided to inmates by Defendant Dawson between September 17, 2021, and November 5, 2021.

469) Plaintiff attests that on September 17, 2021, and October 14, 2021, Defendant Dawson was the advanced practice nurse practitioner that provided medical services to him while not within the framework of an established protocol maintained on-site.

470) As a result of the medical care services being rendered to patients within Putnam Correctional Institution's Medical Department during that same period of time, Plaintiff was deprived of the level of medical care he required

for treatment of a serious chronic skin disease, which remained unstable at the time medical services were rendered to him on September 17, 2021, and October 14, 2021.

471) Plaintiff's serious chronic medical condition required medical care provided by a licensed physician and/or a specialist.

472) Defendant Dawson's failure to make the necessary referrals to advance Plaintiff's care to a licensed physician is evidence that there was no licensed physician available at Putnam Correctional Institution at the time medical services were rendered to him and of operating a medical department outside the framework of an established protocol maintained on-site.

473) At all relevant times Plaintiff was suffering from itching, rash-like bumps, wart-like thickened patches and bumps, puss-filled blisters, atrophy, excoriated lesions, painful skin infections, severe scarring and disfigurement of the skin, difficulty sleeping, humiliation, depression, stress, and the feeling of hopelessness.

474) Defendant Centurion's failure to provide medical services to patients in accordance with Florida Law and the negotiated contract with the Florida Department of Corrections was the direct cause of Plaintiff's continued suffering and resulted in substantial and irreparable bodily harm.

475) Defendant Centurion's actions were undertaken intentionally, with malice,

and/or with reckless indifference to Plaintiff's rights.

476) Plaintiff formally served his Notice of Intent to Initiate Medical Negligence Litigation on Defendant Centurion on October 19, 2021.

477) As of the filing date of this Complaint, Plaintiff's skin disease remains unresolved, inaccurately diagnosed, and continues to be prescribed inappropriate/inadequate medications that do not provide him any relief from his suffering of itching, prickly or biting sensations, rash-like bumps, wart-like thickened patches and bumps, puss-filled blisters, atrophy, excoriated lesions, painful skin infections, severe scarring and disfigurement of the skin, difficulty sleeping, humiliation, severe depression, stress, and the feeling of hopelessness.

## V.   Injuries

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.

A.   As a result of not receiving adequate medical care over the course of approximately 5 years, Plaintiff's symptoms continued in their intensity and frequency, spreading to every area of his body and caused him to suffer discomfort, intense itching, wart-like patches and bumps, excoriated lesions (some very large), atrophy, many painful skin infections that

resulted in severe scarring and disfigurement of the skin, and loss of hair.

B.   Plaintiff's skin has been severely damaged and has numerous deep tissue scarring from head to toe, including his face.

C.   Plaintiff had much difficulty sleeping during the night as that is the time when his symptoms of intense itching were noticed and felt the most.

D.   The above-listed symptoms were also causing Plaintiff to suffer, depression, stress, humiliation, and caused him to feel hopeless and isolated from other inmates, as most stayed away from him due to his appearance and their firm belief that Plaintiff was contagious.

E.   Plaintiff was forced to wear uncomfortable clothing such as long sleeve shirts and long pants during hot summer months with no air conditioning in housing units in order to conceal the symptoms of his skin disease.

F.   Often times Plaintiff's recreation activities became limited due to the pain from major skin infections.

G.   Plaintiff was unable at times to be groomed in a barber shop because of an FDC policy that restricts inmates with excoriated lesions and infections on their scalp to be groomed.

## VI. Relief

State briefly what you want the court to do for you. Make no legal arguments.
Do not cite any cases or statutes. If requesting money damages, include the
amounts of any actual damages and/or punitive damages claimed for the acts
alleged. Explain the basis for these claims.

A.  Issue a declaratory statement stating that:

1.  Defendant Centurion's policies, customs, directives, or practices were
    the causation of inadequate medical care for Plaintiff's medical needs.

2.  The policies, customs, directives, or practices were the causation of the
    denials of Consultation Requests and/or delays in providing Plaintiff
    access to a specialist for necessary medical care at a level required for
    treatment of his serious medical condition.

3.  The policies, customs, directives, or practices were the causation of
    Plaintiff's suffering, and substantial and irreparable bodily harm.

4.  The implementation or use of the policies, customs, directives, or
    practices violated Plaintiff's civil rights under the Eighth Amendment to
    the United States Constitution.

B.  Issue an Injunction ordering Defendant Centurion to:

1.  Provide Plaintiff access to a specialist for an in-person consultation so
    that a physical examination can be conducted and so diagnostic tests

may be performed as needed so that an accurate diagnosis can be achieved;

2. Ensure Plaintiff continuity of adequate medical care provided by a specialist until the symptoms of his skin disease are cured, contained, or limited.

3. Adhere to any recommendations for treatment promulgated by a specialist and prescribe medication without delay and without interruption.

C. Award compensatory damages in the following amounts:

1. $400,000 jointly and severally against Defendants's Jackie Westfall, Loretta Dawson, R. Laubaugh, Max Solano, S. Perry, R. Molina, D. Wetterer, L. Romulus, H. Bhadja, C. Marius, D. Jenkins, Jane Doe #1, and Jane Doe #2 for the physical and emotional injuries Plaintiff sustained as a result of their negligent acts and failure in providing him adequate medical care for a serious medical condition.

D. Award punitive damages in the following amounts:

1. $50,000 each against Defendant's Jackie Westfall, Loretta Dawson, R. Laubaugh, Max Solano, S. Perry, R. Molina, D. Wetterer, L. Romulus, H. Bhadja, C. Marius, and D. Jenkins, Jane Doe #1, Jane Doe #2.

F. Grant such other relief as it may appear that Plaintiff is entitled.

## VII.  Exhaustion of Administrative Remedies Administrative Procedures

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other co other correctional facility until such administrative remedies as are available are exhausted."

Administrative remedies are also known as grievance procedures. Your case may be dismissed if you have not exhausted your administrative remedies.

A.  Did your claim(s) arise while you were confined in a jail, prison, or correctional facility?

☑Yes
No

If yes, name the jail, prison, or other correctional facility where you were confined at the time of the events giving rise to your claim(s).

- Taylor Correctional Institution – July 6, 2018 thru December 26, 2018
- South Florida Reception Center-South Unit –January 2019 thru June 2019
- Okeechobee Correctional Institution –July 2019 thru December 2019
- Madison Correctional Institution –April 2020 thru July 2020
- Mayo Correctional Institution –July 2020 thru November 2020
- Putnam Correctional Institution –December 2020 thru Present
- Reception and Medical Center –August 9, 2021.

B.  Does the jail, prison, or other correctional facility where your claim(s) arose have a grievance procedure?

☑Yes

C.  Does the grievance procedure at the jail, prison, or other correctional facility where your claim(s) arose cover some or all of your claim(s)?

☑Yes
No

D.  Did you file a grievance in the jail, prison, or other correctional facility where your claim(s) arose concerning the facts relating to this complaint?

☑Yes

No

E.  If you did file a grievance:

1.  Where did you file the grievance?

    Various Institutions–Taylor CI; SFRC; RMC; Madison CI; Putnam CI.

2.  What did you claim in your grievance?

    a.  Continued prescribing of medication that proved ineffective.
    b.  Continued prescribing of medication that proved ineffective.
    c.  Failure to provide adequate medical care.
    d.  Refusal to provide access to medical specialist.
    e.  Denial of access to a medical specialist.
    f.  Prolonged delay in access to a specialist.
    g.  Emergency Grievance – Prolonged delay in access to a specialist.
    h.  Denial of access to medical care via sick call request.
    i.  Failure to provide adequate medical care during specialist consultation.
    j.  Specialist was negligent in making his recommendation for treatment.
    k.  Failure to provide adequate medical care during appointment with care provider.
    l.  Refusal to provide photocopies of requested medical documents within 10 business days of the request.

3.  What was the result, if any?

    a.  Denied
    b.  Denied
    c.  Denied
    d.  Denied
    e.  Approved
    f.  Approved
    g.  Denied
    h.  Denied

111

     i.  Denied

     j.  Returned without action

     k.  Returned without action

     l.  Approved

4. What steps, if any, did you take to appeal that decision? Is the grievance process completed? If not, explain why not.

All Grievances that were denied at the institutional level were appealed to the Bureau of Grievance Appeals. Approved grievances no further action was necessary. For Grievances Appealed and returned without action, these appeals were erroneously construed to be based on the same facts as a separate grievance regarding completely different facts.

F.   If you did not file a grievance:

1. If there are any reasons why you did not file a grievance, state them here: N/A

2. If you did not file a grievance but you did inform officials of your claim, state who you informed, when and how, their response, if any: N/A

G.   Please set forth any additional information to this complaint that is relevant to the exhaustion of your administrative remedies. N/A

## VIII. Previous Lawsuits

The "three strikes rule" bars a prisoner from bringing a civil action or an appeal in federal court, without paying the filing fee if that prisoner has "on three or more occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury." 28 U.S.C. § 1915(g).

To the best of your knowledge, have you had a case dismissed based on this

Yes

☑No

If yes, state which court dismissed your case, when this occurred, and attach
a copy of the order if possible.

A. Have you filed other lawsuits in state or federal court dealing with the same

facts involved in this action?

Yes

☑No

B. If your answer to A is yes, describe each lawsuit by answering questions 1
through 7 below.

1. Parties to the previous lawsuit:

Plaintiff(s):

Defendant(s):

2. Court:

3. Docket or index number:

4. Name of Judge assigned to your case:

5. Approximate date of filing lawsuit:

6. Is this case still pending?

7. What was the result of the case?

C. Have you filed other lawsuits in state or federal court otherwise relating to
the conditions of your imprisonment.

## IX.  Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

## A. For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:    January 25, 2022

Signature of Plaintiff:    _Steve Winch_

Printed Name of Plaintiff:  Steven Winch

Prison Identification No.: L21077

Prison Address: Putnam Correctional Institution

128 Yelvington Road

East Palatka, Florida 32131